[L. A. No. 8195. In Bank.—January 6, 1926.]

## IDA A. MORGAN CLARK, Respondent, v. HOMER C. MILLSAP et al., Appellants.

[1] CORPORATIONS—FORFEITURE OF CHARTER—DIRECTOR AS TRUSTEE—PLEADING—DEMAND FOR AFFIRMATIVE RELIEF.—Where an attorney, one of the original organizers of a corporation, is an officer and director thereof at the time the corporation forfeits its charter by failure to pay its franchise tax, he thereupon by operation of law becomes a trustee of said corporation; and where, by his answer to a suit thereafter brought against such corporation, he assumes to be a trustee by demanding, on behalf of the corporation, a judgment in its favor and against plaintiff in a specified sum, he places himself in the office of a trustee.

[2] ID.—LEGAL ENTITY—COVER TO COMMIT FRAUD—INTENT AND PURPOSE—ENTITY.—While a corporation may be considered a legal entity when used for the accomplishment of a legal purpose, it cannot be used as a cover under which wrongs may be committed and fraud perpetrated, but in such a case the court will look through the form of the corporation to ascertain its actual purpose and intent, and if the purpose and intent of the corporation are bad, its corporate entity will be no cover for wrong, fraud, and bad faith.

[3] ID. — DISSOLUTION — ONE-MAN CONTROL — PERSONAL RESPONSIBILITY.—While upon the dissolution of a corporation the directors

1. See 7 Cal. Jur. 167.
2. Disregarding corporate existence, notes, 1 A. L. R. 610; 34 A. L. R. 597. See, also, 6 Cal. Jur. 591; 7 R. C. L. 27.
3. See 6 Cal. Jur. 592.

become the trustees for the creditors and they may be sued in any court of this state, this does not mean that a person who has at all times exercised absolute control over a corporation and used it wrongfully as a medium to enrich himself will not be held personally responsible for this misfeasance.

[4] ID. — USE OF ENTITY TO CONSUMMATE WRONG — FRAUD OF STOCK-HOLDERS—ACTION—PARTIES.—It may not be necessary under some circumstances to make the corporation which was used as an entity merely to consummate a wrong a party to the action, but the facts of a case may be such as to require a court of equity, which always has inherent power in such cases, to treat the corporation and the individuals owning all of its stock as identical, and thus corporate entity, existing as such entirely distinct from its members, may be ignored in order to circumvent the fraudulent purposes of the stockholders in its organization.

[5] ID.—FRAUD—IDENTITY OF INDIVIDUAL AND CORPORATION—EQUITY.— In order to redress wrongs committed by fraud and protect third person's rights or to prevent a palpable injustice, equity will interfere and cast aside the legal fiction of a corporate existence and deal with the corporation and stockholders as identical entities with identical duties and obligations; and where an individual is the owner of all the corporate capital stock and uses the corporation merely as an instrumentality through which he transacts business, the separate entities will be disregarded when necessary to prevent fraud and to protect the rights of third persons.

[6] ID.—CORPORATE ENTITY—FRAUD—EQUITY.—The doctrine of corporate entity is not so sacred that a court of equity will hesitate to look through form to the substance of the thing, and it may in proper cases ignore it to preserve the rights of persons imposed upon or circumvented by fraud, and in such cases corporate fiction is disregarded.

[7] ID. — SCHEME TO DEFRAUD CREDITORS — TRANSFER OF ASSETS TO CORPORATION—FORFEITURE OF CHARTER—ACCOUNTING—PARTIES.— Where an attorney, in pursuance of a fraudulent scheme to prevent a person who is suing one of said attorney's clients from realizing on any judgment that might be recovered, causes a corporation to be formed and induces said client to transfer all her assets to said corporation, and thereafter in all his transactions with said client, except in such respects as the requirements of law compelled him in order to accomplish his purposes to adhere to the forms of corporate procedure, absolutely disregards the corporate entity, he will not be able to defeat a subsequent action by said client against him for an accounting of the property which came into his possession as the result of his unlawful methods merely because all the trustees of the corporation (which had become defunct), of which he was one, were not sued in conjunction with himself.

[8] ATTORNEY AND CLIENT — FRAUD — POSSESSION OF PROPERTY OF CLIENT—TRUST RELATIONSHIP.—Said attorney sustained a double trust relation to his said client, first, by force of the provisions of section 2224 of the Civil Code, which provides that "one who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it," and, second, by virtue of the fiduciary character of the relationship existing between an attorney and his client, which prevented him from gaining an advantage from her as the result of a transaction that he did not prove was fair.

[9] ID. — CONCEALMENT OF PROPERTY — CLIENT IN PARI DELICTO — EQUITY.—The law will not hold a client *in pari delicto* with her attorney, where said client, acting under his influence and advice, places her property in his name and possession for the purposes of concealment; and the commonplace maxims of equity that "he who seeks equity must do equity" and "he who comes into a court of equity must come with clean hands" can have no application to an action by a client against her attorney for an accounting as to properties which the client, as the result of the advice and solicitations of said attorney, turned over to him for the purpose of preventing collection of a probable judgment in a suit by a third person against said client.

[10] ACCOUNTING—REFEREE—FINDINGS—REVIEW BY COURT.—In an action for an accounting, where a referee is appointed by the court, with the consent of counsel, to take and state the account of all transactions had between the parties thereto and each of them, and it is stipulated that all exceptions or objections to the report or findings of the referee might be made by either party at the time of the trial with like effect as if a bill of exceptions had been prepared, settled, and allowed and filed in said action, and such referee is not authorized to try all issues of fact and law and to report a finding and judgment thereon as provided by section 638, subdivision 1, of the Code of Civil Procedure, a clerical duty only is committed to the referee, and the court is not bound to accept as conclusive and binding the findings of the referee, particularly where his report is not supported by evidence which

8. Right of client to recover property placed in name of attorney to defraud creditors, note, 37 L. R. A. (N. S.) 161. See, also, 25 Cal. Jur. 145; 26 R. C. L. 1232.

9. Fact that parties are not *in pari delicto* as affecting right to relief, note, 7 A. L. R. 150. See, also, 10 Cal. Jur. 514, 519; 10 R. C. L. 389, 392.

10. See 1 Cal. Jur. 184; 22 Cal. Jur. 697; 23 R. C. L. 299.

is deemed satisfactory by the court, but it has the inherent power to set it aside, as if it were a jury verdict.

[11] Attorney and Client — Fraud — Compensation. — A court may refuse to allow an attorney any sum as an attorney's fee if his relations with his client are tainted with fraud.

[12] Id. — Action by Client for Accounting — Statute of Limitations — Estoppel. — In this action by a client against her attorney for an accounting, the statute of limitations could not be invoked by defendant, who induced plaintiff to turn all her property over to him for the purpose of concealment from creditors and thereafter she was practically an exile from her residence for a period of years, living a portion of the time in a foreign country under an assumed name upon the advice of defendant and all information concerning the condition of her affairs was withheld from her on the theory that if her presence should be discovered she would be unable to furnish any information on supplemental proceedings as to her financial situation, and after her return she was denied an inspection of the books and accounts and was refused information she was entitled to receive.

[13] Id. — Inconsistent Findings — Just Judgment — Appeal. — Upon appeal from a judgment in favor of the plaintiff, in an action by a client against her attorney for an accounting as to moneys turned over by the former to the latter, where the findings, which are voluminous, contain some slight inconsistencies but they are not so serious as to confuse the substantial issues, the appellate court will not make its examination of the record so searchingly technical, if fairly sustainable, as to overthrow a just judgment.

[14] Id. — Sinister Designs upon Client — Relief to Attorney — Equity. — An officer of the court, such as an attorney, who finds himself enmeshed by the skeins which he has designedly woven to encompass another, will not be assisted by a court of equity from the peril of his position, if to do so would militate against the advantage of the client upon whom he had sinister designs.

---

(1) 14 C. J., p. 432, n. 66.　(2) 14 C. J., p. 52, n. 23, p. 61, n. 78. (3) 14 C. J., p. 278, n. 39.　(4) 14 C. J., p. 59, n. 71.　(5) 14 C. J., p. 61, n. 78.　(6) 14 C. J., p. 61, n. 78.　(7) 14 C. J., p. 61, n. 78. (8) 6 C. J., p. 686, n. 19, 22, p. 687, n. 23, p. 694, n. 4.　(9) 6 C. J., p. 691, n. 64; 21 C. J., p. 175, n. 23, p. 190, n. 75.　(10) 6 C. J., p. 693, n. 82; 34 Cyc., p. 852, n. 37, p. 878, n. 99 New.　(11) 4 C. J., p. 880, n. 18; 6 C. J., p. 723, n. 93, 94, 95.　(12) 37 C. J., p. 948, n. 77.　(13) 4 C. J., p. 908, n. 64.　(14) 6 C. J., p. 568, n. 22, p. 693, n. 95 New.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles S. Burnell, Judge. Affirmed.

---

11. See 2 R. C. L. 1062.

The facts are stated in the opinion of the court.

Anderson & Anderson and F. E. Davis for Appellants.

Bradner W. Lee, Bradner W. Lee, Jr., and Kenyon F. Lee for Respondent.

SEAWELL, J.—This is an action in accounting. Defendant and appellant, Homer C. Millsap, an attorney admitted to practice law in the courts of this state, was employed in April, 1913, by Mrs. Ida A. Morgan, since married to Charles W. Clark, plaintiff and respondent herein, to act as her attorney and counselor at law and represent her in certain legal matters then pending or about to be commenced in the courts of this state, both against her and in her behalf. It is alleged and was found by the court to be true that at various times between April, 1913, and the first day of January, 1922, respondent, without the aid of any independent advice whatsoever in the premises, and relying solely upon appellant as a counselor at law in good faith to advise and direct her in all matters of a legal or equitable nature that should arise in the course of his employment as such attorney and counselor, did, upon the advice, counsel, and solicitation of appellant as her said attorney, assign, transfer, and set over to him to be by him held for her benefit pending a threatened contingency long since passed, and then to be returned to her, certain real and personal property of great value, consisting of two parcels of land situate in the province of Manitoba, Canada, 500 shares of the capital stock of the Chamber of Commerce Safety Vault Company of Chicago, of the value of $150 per share, aggregating $75,000, and three lots of real property situate in the city of Pasadena, this state. Certain mining properties known as the Perris Group of Quartz Mining Claims and the Desert Queen Mining Claim, located in the county of San Bernardino, this state, and owned by Mrs. Morgan, seem not to have been conveyed but were turned over to the control and management of appellant. That the said defendants and appellants, Millsap and his wife, Bernice Williams Millsap, into whose hands also a portion of said properties came, have failed and refused to return any of the said properties or the proceeds therefrom, except certain relatively small spe-

197 Cal.—49

cified sums, all of which was in violation of the trust and
confidence which respondent reposed in appellant as her
counselor and attorney at law. The complaint sets forth a
general plan and scheme adopted by appellant Homer C.
Millsap, who was later aided and abetted therein by his
wife, Bernice Williams Millsap, by which the said Homer
C. Millsap would come into the possession and control of the
entire estate of the respondent, and thereupon appropriate
to the use of himself and his wife practically said entire
estate. A prayer for general relief is added to the petition
for an accounting.

The outstanding facts of the controversy are as follows:
William Morgan, the first husband of respondent, died Janu-
ary 12, 1912. Appellant's employment by Mrs. Morgan
began in April, 1913. Practically all of the properties which
form the basis of the judgment in this action, from which
this appeal is prosecuted by appellants, came to her by the
decree of distribution in the estate of her deceased husband,
William Morgan, entered on the fourth day of May, 1914.
It was during her earlier period of widowhood that she sur-
rendered herself to the domination of her attorney. The
transactions into which she was led show very clearly that
she was a woman without previous business experience.

While visiting at her mining properties located in San
Bernardino County, respondent became involved in an al-
leged blackmail plot, the sequel of which was that one Mrs.
Budd brought an action against her for the alienation of her
husband's affections. The employment of the appellant to
defend her against this action was the beginning of the re-
lationship of attorney and client, out of which the present
action arose. The trial resulted in a judgment in favor of
the plaintiff, Mrs. Budd, against Mrs. Ida A. Morgan, the
defendant, in that action and respondent in the instant case,
in the sum of $15,000. The judgment was thereafter re-
versed. (*Budd* v. *Morgan*, 187 Cal. 741 [203 Pac. 754].)
Appellant, Homer C. Millsap, as her attorney and counselor
in said action, advised her that the only method by which
her property could be made secure against a forced sale
upon execution, and thereby defeat any judgment that might
be obtained against her, was for him to organize a "holding
corporation" and upon its organization she should at once
transfer and convey all of her property and tangible assets
to said corporation. This project having been consented to,

he thereupon organized such a corporation for the admitted purpose of defeating the court's orders and processes. The court found, however, that the real reason that moved Mr. Millsap to form the corporation was to gain for himself control and possession of respondent's estate that he might appropriate it to his own use and benefit. The corporation thus formed as a ''holding corporation'' was styled the M. M. Investment Company. It took over practically the entire estate of Mrs. Morgan. Much of the real property and the larger portion of the securities were converted into cash and taken possession of by Millsap. The original incorporators were Leroy Millsap, a brother of appellant, E. D. Forbes, and appellant H. C. Millsap, all of whom were present at the first meeting of the incorporators, held June 27, 1914, and were elected president, vice-president, and secretary, respectively. They also constituted the entire list of the original stockholders. Leroy Millsap was succeeded as president by P. C. Lynch. Forbes shortly withdrew as a director and vice-president and Mrs. Morgan became a director and was made vice-president and treasurer. On the 29th of June, 1914, one of the two shares of stock formerly held by Forbes was transferred to Lynch and the other share was transferred to H. C. Millsap and 94 shares were issued to Mrs. Morgan. On the following day 53 of Mrs. Morgan's 94 shares were transferred to Leslie Willis Whitlow, a minor, who was Mrs. Morgan's nephew. No shares of stock were ever delivered to him. Indeed, if any deliveries were actually made to the purported owners of stock such deliveries were made as a ruse and in furtherance of the general fraudulent plan. On July 21, 1914, one of H. C. Millsap's shares of stock was transferred by him to his stenographer and law clerk, Miss Georgia Elster. On September 8, 1914, 25 of the 41 shares of stock remaining in the name of plaintiff were transferred to H. C. Millsap and 15 shares were transferred to Whitlow. The foregoing brief entries exhaust the information furnished by the stock certificate book. Stubs of certificates have been torn from the stock-book and one certificate was not issued. The last certificate to be issued was Number 16. Important records of the corporation were lost or destroyed if actually made. The capital stock of the corporation was 100 shares of the par value of $100 per share. Speaking to the purpose of the corporation's existence Mr Millsap at the trial said: ''The

whole proposition as I have explained—to cover up; that
was their desire and that was the only way I knew how to
do it." Again he testified: "As I have explained before,
and as I understand, this whole arrangement from the very
inception of the thing, it was to defeat these people if pos-
sible. It seems to me, from the facts in the case, that any
reasonable justifiable means on earth of defeating those peo-
ple should be pursued. Mrs. Morgan, of course, gave Mr.
Lynch her power of attorney. I had no thought in the
matter other than to accomplish what we were all trying
to do. Our theory was to defeat the litigation. Mr. Lynch
said that we had started this thing and in his notion the
proper thing to do was to send to Mrs. Morgan from time
to time such monies as would be sufficient to carry her along
and that upon the termination of the litigation, then we
would settle the whole thing up." He testified to the fact,
which was amply established by the testimony of other wit-
nesses, that "all the money we received was money received
from the property which Mrs. Morgan transferred to the
corporation." He also stated that no dividends had ever
been declared by the corporation. In speaking further as
to the purpose to be served by the formation of the corpora-
tion, he said: "Now, Leslie Whitlow, was a young man, a
nephew, and I didn't really pay any particular attention to
Mr. Whitlow, because I felt that Mr. Whitlow was cognizant
of what was going on. In fact, he had nothing to do with
it, as I rather looked at it. Now, as I have explained before,
that was the position that we took at the inception, and I
had always understood that Mrs. Morgan in reality—I felt
in reality that whenever the time came that Mrs. Morgan
could procure a transfer of the stock that whatever the
assets of the corporation were would go to Mrs. Morgan."
"The Court: Q. That is what I am getting at. Was not the
whole theory of the transaction, then, that this was Mrs.
Morgan's property that was transferred to the corporation
for the purpose of holding the property, that being for the
purpose of defeating possible judgment creditors of Mrs.
Morgan, and that when the danger was over by reason of
lapse of time or by reason of successful art, of the litigation
as far as Mrs. Morgan was concerned, that that property
would be turned back to her; in the meanwhile she was paid
the proceeds and given sums of money from time to time.

Wasn't that the whole transaction? A. That is the ultimate effect I expected to accomplish, but here is the situation. . . . '' The appellant at this point digressed from the question to make the claim that the stock of the corporation and its assets belonged to its stockholders and not to Mrs. Morgan, as she had transferred her stock to Whitlow, retaining but one share, and that her interest in the corporation was limited to one share.

Repeatedly throughout his testimony appellant admitted that the only property owned at any time by the corporation was property transferred to it by Mrs. Morgan and that no one else at any time had contributed or paid a dollar thereto for the purchase price of stock issued to the said several stockholders. Neither is it claimed that anyone performed services for the corporation. Miss Elster, formerly Millsap's stenographer, described the purposes of the corporation in these words: "The M. M. Investment Company was a closed corporation, organized and incorporated under the laws of the State of California, to which all of the property of Ida A. Morgan, or all of the property of Ida A. Morgan then in the United States was transferred. The real purpose of the formation of this corporation was to avoid the payment of any judgment which might be obtained in California against Mrs. Morgan. . . . The whole thing was planned, cut and dried. . . . From my knowledge gained in the office and from some conversations in the office, I saw that the purpose of the formation of the Company was to avoid payment of any judgment which might be obtained in the case of Budd v. Morgan."

The fraudulent purpose of the corporation being admitted, it is not necessary to devote more time to that subject. Its office was at Mr. Millsap's law office, where the books and documents were supposedly kept unless removed elsewhere for convenient purposes, and there seem to be but few records of any important proceedings which bear the stamp of verity. Records and correspondence that might be of value to the respondent and which doubtless bore a "telltale" aspect were destroyed. Respondent had been advised to destroy all letters and writings of every kind which would tend to throw any light upon her transactions with the corporation or her attorney, Millsap. Bernice Williams Millsap, codefendant and wife of Homer C. Millsap, prior

to her marriage and a short time thereafter was stenographer and confidential secretary of said Homer C. Millsap and latterly handled the respondent's funds and mingled them with her own funds and with those of her husband, as found by the court. On February 28, 1920, the corporate powers, rights, and privileges of the M. M. Investment Company were suspended for failure to pay the corporation tax required by the laws of this state. On July 18, 1920, said tax having been paid, said corporation was restored to its former corporate powers, rights, and privileges. On March 5, 1921, said corporation's powers, rights, and privileges were again suspended for a failure to pay the corporation tax, and it has since stood suspended and incapable of exercising corporate powers.

The amended complaint states four causes of action. The first cause of action joins H. C. Millsap, said suspended corporation, and Bernice Williams Millsap, and alleges the misappropriation by them and each of them of moneys and property belonging to the plaintiff in the sum of $60,232.57. By the second cause of action it is alleged that in May, 1913, plaintiff, Mrs. Morgan, employed said Homer C. Millsap as her attorney to defend her in the suit of *Budd* v. *Morgan, supra,* for which it was agreed by her and said Millsap that he should receive in full for all services performed by him the sum of $7,500, said Millsap to pay all costs and expenses of every kind and character that might arise out of said action; that in May, 1914, she paid him said sum of $7,500 for the purposes above stated. That she was compelled thereafter to pay costs and counsel fees arising out of said action, aggregating $1,951.30, which Millsap had agreed to pay and which it was his duty under said contract to pay, but that he has since refused and failed to pay said sum or any part thereof, wherefore she asks to be reimbursed for said payments made by her on account of Millsap's failure and refusal to keep his contract. The third cause of action sets out circumstances antedating and attending the making of a promissory note by respondent in favor of H. C. Millsap in the sum of $20,000 while she was in hiding at Vancouver, British Columbia, where she had been advised by Millsap to go and remain under a fictitious name to avoid being served with any kind of legal process. The note, which purported upon its face to have been exe-

cuted at Los Angeles, California, under date of June 30, 1914, was in fact signed at Vancouver, British Columbia, on December 25, 1914. It had been prepared by Millsap at Los Angeles and dispatched to Vancouver by special messenger, Miss Georgia Elster, Millsap's stenographer, who was directed to explain to the plaintiff, Mrs. Morgan, that her signature did not "mean anything" as to her and she would be held harmless, but her signature thereto was necessary to the execution of the general plan and scheme that he was evolving for her benefit and welfare. The note as carried by the messenger had written upon it in ink, "Paid in full, September 8, 1914, H. C. Millsap." Said $20,000 note was signed according to instructions, but remained in the possesion of its maker, Mrs. Morgan. It was intended that it should remain in her possession. This transaction, if free from the taint of fraud, would have reduced his obligation to that extent. There is nothing about the transaction itself which suggests that it had any connection whatsoever with the payment of an attorney's fee. It bears no such indicia and the transaction is not in accord with the ordinary course of business. The *bona fides* of this transaction presents one of the main controverted facts urged upon appeal, the contention of appellant being that the item of $20,000 was the fee that he was to receive for professional services rendered through a long course of litigation. On the other hand, the claim is made by respondent that appellant Millsap agreed to perform all the services undertaken by him for the sum of $7,500, out of which sum he was to pay the costs as heretofore noted. The trial court found against appellant's contention and refused to allow him any credit on account of said note on the ground that its execution was fraudulently procured was without consideration. By the fourth cause of action plaintiff alleges much of the matter contained in the first cause of action and prays for judgment for the sum of $60,232.57 on account of moneys had and received. In avoidance of the statute of limitations it is alleged that all knowledge of the fraudulent dealings of appellant Millsap with respect to respondent's property was designedly kept concealed from her and that she was misled and deceived by the fraudulent statements and acts of appellant Millsap as to the true condition of her estate. It is also claimed that all books, papers, and records

purporting to relate to the business and transactions in controversy were at all times in the possession and under the control of appellants and that she at no time had access to or was accorded the privilege of inspecting any books or papers purporting to record said transactions affecting her property, but was compelled to rely upon the statements of her attorney, H. C. Millsap, which information subsequently proved to be false and untrue. She also alleged that no claim was made by appellant as to his right to an attorney's fee in the sum of $20,000, nor did she have any knowledge of the fraudulent use or appropriation of any part of her estate by appellants until six months next preceding the commencement of said action. The deceptions practiced and the withholding of knowledge and information from the respondent, and her confidence and faith in her said attorney, are sufficiently pleaded and proved to relieve her from the bar of the statute and it is unnecessary to refer further to this issue.

The defendants, Homer C. Millsap and Bernice Williams Millsap, demurred separately to the amended complaint. The grounds of demurrer are practically the same, being both general and special. Misjoinder and defect of parties defendant in that the directors of the M. M. Investment Company at the time of the forfeiture of its charter and the trustees thereof, other than Homer C. Millsap, were not joined as defendants in the action, and, secondly, that the M. M. Investment Company, a defunct corporation, was improperly joined as a party defendant in the action with the other defendants, were also urged as grounds of demurrer, but the objections were overruled. Homer C. Millsap answered individually and also as a trustee for the M. M. Investment Company, and Bernice Williams Millsap made joint answer with him. Defendant H. C. Millsap admitted his employment in April, 1913, by respondent, to represent her in the case of Budd against Morgan and also to represent her in the matter of the estate of William Morgan, deceased, which proceeding was then pending in the superior court of the county of Los Angeles. He denied that any agreement had been made between Mrs. Morgan and himself as to the amount of the compensation to be paid him for his legal services until the fifteenth day of January, 1914, on which day a contract was made and entered into between

him and Mrs. Morgan.  He averred that he continued to
render services for her pursuant to said contract of employ-
ment until June 30, 1914, on which day the prior contract
was by mutual consent canceled, and a contract for remu-
neration in the sum of $20,000 was made because of threat-
ened litigation not contemplated by said parties at the
time the other contracts were made.  He denied that he
was at all times the sole adviser of plaintiff, Mrs. Morgan,
or that she at all times followed or relied upon his advice,
or that she delivered or entrusted to him the property de-
scribed in the complaint.  He denied that he took any
part in the sale of the 500 shares of capital stock of the
Chamber of Commerce Safety Vault Company made to R.
Floyd Clinch.  He further denied that he had advised the
plaintiff that her said property could be more easily and
effectively managed if a corporation were formed and said
property was transferred, conveyed, assigned, or delivered
to said corporation.  He admitted and averred that there
was pending at the time plaintiff transferred and conveyed
to said corporation the property described in the complaint,
certain actions for damages against Mrs. Morgan, amount-
ing to $110,352, and that Mrs. Morgan, for the purpose of
defeating the collection of any sum whatsoever by plaintiffs
against her in said several actions, and to avoid the payment
of any judgment or judgments which might be rendered
against her, conveyed to the corporation the property de-
scribed in the complaint and received in payment therefor
stock of the M. M. Investment Company which, subsequently
to the transfer, was sold and transferred by her.  Incorpo-
ration of the M. M. Investment Company under the laws of
the state of California is admitted but denial is made by
Mr. Millsap that he was, at any time subsequent to July 21,
1914, an officer or director of said corporation.  Denials are
also made to the allegations of the complaint to the effect
that defendant H. C. Millsap collected certain large sums
of moneys belonging to Mrs. Morgan but admissions are
made that said sums were received by the M. M. Investment
Company.  Both defendants by answer denied that after the
transfer of the properties to said corporation was made that
the plaintiff had any interest therein except as that of a
stockholder.  Both denied that Bernice Williams Millsap re-
ceived at any time any money or property belonging to the

*plaintiff*. It is not denied by either of the defendants that large sums of money belonging to the *investment company* were received by them. Their denials go only to the *ownership* of the property. Attorney Millsap by separate answer denied that he agreed to defend the Budd case for $7,500 or that he was paid that sum by plaintiff for said services, but on the contrary averred that plaintiff had agreed with him upon a $20,000 fee basis, and that he, Millsap, was to pay the costs, etc. While the answer makes reference to each allegation of the complaint not all of the issues raised therein are squarely met but in a number of respects the denials are somewhat evasive. The defendants admit that the plaintiff is not indebted to either of them in any sum but affirmatively aver that she is indebted to the M. M. Investment Company in the sum of $37,500, and on behalf of said corporation ask that judgment in that sum together with interest be entered against her and in favor of said corporation. The provisions of sections 337 to 341, both inclusive, of the Code of Civil Procedure are pleaded as a bar to the action.

The court found in favor of the plaintiff and against defendants, H. C. Millsap and wife, on every material allegation of fraud alleged in the complaint and on every material issue pleaded therein. In view of the findings made by the court the objections made to the pleadings on the ground of misjoinder of parties defendants—that is to say, whether the corporation or its trustees were necessary parties—are of but slight consequence. The positions taken by the defendants as to the question of misjoinder is rather unique. By their demurrer they objected to the joining of the *corporation* with them and complained because the *trustees* of the corporation were not joined. During the trial of the case the court dismissed the corporation from the action on motion of plaintiff, a ruling which defendants had previously insisted upon, but to which ruling when about to be made, they interposed vigorous objection. **[1]** It is alleged by the complaint that H. C. Millsap was one of the original organizers of the corporation and was an officer and director thereof at the times it twice forfeited its charter by failure to pay its franchise tax and he thereupon by operation of law became a trustee of said corporation. (Sec. 416, Code Civ. Proc.) By his answer he assumed to be a trustee by demanding, on behalf of the corporation, a judgment in its

favor and against plaintiff in the sum of $37,500. By so
doing he placed himself in the office of a trustee. Acceding
to the claims of appellants that the corporation was legally
organized and that its corporate entity could not be collater-
ally attacked, this single circumstance would not render the
defendants immune from liability in an action brought
against them based upon fraud in a transaction such as this
case presents. But whether the defendant H. C. Millsap
will be heard to urge a failure to join the trustees with him
is a question attended with serious doubt. At the time the
action was commenced the respondent was the equitable
owner of all the stock of the corporation. The persons in
whose names it stood upon the books and the number of
shares of stock purported to be held by each were as fol-
lows: Homer C. Millsap, 27 shares; Georgia Elster, his
stenographer, 1 share; Leslie Whitlow, nephew of respond-
ent, 68 shares; T. C. Lynch, 3 shares. Not one of the fore-
going named persons, excepting Mrs. Morgan, paid anything
at all for the stock that stood in their respective names.
About the time the corporation was formed Mrs. Morgan
paid into it the sum of $10,000, which sum was equal in
amount to its paid-up capital stock. This sum was to be
regarded as surplus earnings and was to be used as an ex-
pense fund. It was soon thereafter depleted. Article XII,
section 11, of the constitution of this state provides: "No
corporation shall issue stock or bonds, except for money
paid, labor done or property actually received," etc. Sec-
tion 359 of the Civil Code contains a restatement of the con-
stitutional provision. It has been held that shares of stock
issued in violation of said prohibition are void and the par-
ties receiving them do not thereby become shareholders.
(*J. F. Lucey Co.* v. *McMullen,* 178 Cal. 425 [173 Pac. 1000];
*Kellerman* v. *Maier,* 116 Cal. 416 [48 Pac. 377]; *Cortelyou*
v. *Imperial Land Co.,* 156 Cal. 373 [104 Pac. 695]; *Jefferson*
v. *Hewitt,* 103 Cal. 624 [37 Pac. 638]; *Ewing* v. *Oroville
Min. Co.,* 56 Cal. 649.) The statute was again violated by
the issuance of stock as no effort was made to conform to the
requirements of the provisions of the Investment Companies
Act, in effect November 1, 1913, Statutes and Amendments
of 1913, page 715. By section 5 of said act it is made un-
lawful to issue any security or stock unless a certificate or
a temporary permit authorizing the issue thereof shall first

have been secured from the commissioner of corporations as provided by said act. It further provides that "it shall further be unlawful for any investment company, . . . as in this act defined, to sell, offer for sale, negotiate for the sale of or take subscriptions for any stock, stock certificate, bond or other evidence of indebtedness of any kind or character without exhibiting to the prospective purchaser or prospective purchasers of such securities, or any thereof, a copy of the certificate issued to such investment company in accordance herewith." A corporation may, however, without applying for a certificate issue to each of its directors *one* share of stock for the purpose of qualifying as directors, The commissioner of corporations, if *satisfied that the investment company intends to do a fair, just, and equitable business,* may, forthwith upon the filing of the statement and other papers required by section 4 of said act, issue to said investment company, upon such conditions as he may prescribe, a temporary permit to issue its securities pending the examination of said statement and other papers, and may, from time to time, for cause, rescind, alter, or amend said temporary permit. But no application was filed at any time by H. C. Millsap, acting for the corporation, for permission to sell stock or effort made to comply with the requirements of the act in any respect. To do so would have put himself and his corporation under the scrutiny and examination of the commissioner of corporations, evidently a thing he sought to avoid. But waiving the question of failure to comply with the several statutes of this state regulating the formation of and transaction of business by corporations, the plaintiff by force of the broad and liberal principles of equity, was not required to make either the corporation or the trustees thereof parties defendant. In the instant case the corporation, as has been so many times said, was solely a creature of H. C. Millsap, managed and controlled by him. It transacted no business whatsoever, except to receive as a medium, the property of respondent, and formally convey it to other persons. The proceeds of sales went into his own possession. Instead of the corporation being a "holding" concern it was in fact merely a "disbursing" concern. Millsap throughout his long course of handling the estate of respondent did not pretend that he was acting for, or that the transactions were being conducted in behalf of the

corporation, but that they were personal matters between himself, Mrs. Morgan and third parties. All of the papers executed by Mrs. Morgan or by Millsap were executed as the individual act of each, and this of itself would be sufficient to estop him from now asserting that he was not acting for himself but for the corporation. [2] It is a well-recognized rule of law that a corporation may be considered a legal entity when used for the accomplishment of a legal purpose. Corporations, however, cannot be used as a cover under which wrongs may be committed and fraud perpetrated. In such a case the court will look through the form of the corporation to ascertain its actual purpose and intent. If the purpose and intent of the corporation are bad, its corporate entity will be no cover for wrong, fraud, and bad faith. (*MacFadden* v. *Jenkins*, 40 N. D. 422 [169 N. W. 151].) [3] Upon the dissolution of a corporation the directors become the trustees for the creditors and they may be sued in any court in the state. (Sec. 400, Civ. Code.) This does not mean, however, that a person who has at all times exercised absolute control over a corporation and used it wrongfully as a medium to enrich himself will not be held personally responsible for this misfeasance. [4] And it may not be necessary under some circumstances to make the corporation which was used as an entity merely to consummate a wrong, a party to the action. The facts of a case may be such as to require a court of equity, which always has inherent power in such cases, to treat the corporation and the individuals owning all of its stock as identical. Thus corporate entity, existing as such entirely distinct from its members, may be ignored in order to circumvent the fraudulent purposes of the stockholders in its organization. (*Ayer & Lord Tie Co.* v. *Commonwealth,* 208 Ky. 606 [271 S. W. 693].) [5] In order to redress wrongs committed by fraud and protect third persons' rights or to prevent a palpable injustice, equity will interfere and cast aside the legal fiction of a corporate existence and deal with the corporation and stockholders as identical entities with identical duties and obligations. "Where an individual is the owner of all the corporate capital stock and uses the corporation merely as an instrumentality through which he transacts business the separate entities will be disregarded when necessary to prevent fraud and to protect the rights of third

persons." (*Minifie* v. *Rowley,* 187 Cal. 481, 487 [202 Pac. 673] ; *Wenban Estate, Inc.,* v. *Hewlett,* 193 Cal. 675, 696 [227 Pac. 723, 731].) In the last cited case this court said that when such a situation exists, "equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation." While many of the cases cited relate to a situation where but one individual uses the corporate name in the manner suggested, the principle is the same when two or more own the stock and act in conjunction in the name of the corporation. (*McCormick-Saeltzer Co.* v. *Grizzly Creek Lumber Co.* (Cal. App.), 240 Pac. 32] ; *Zenos* v. *Britten-Cook Land & Livestock Co. et al.* (Cal. App.), [242 Pac. 914] ; 6 Cal. Jur. 591.) "Corporate entity is ignored in order that fraud or some kindred wrong may be defeated." (*Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 Pac. 641] ; *Relley* v. *Campbell,* 134 Cal. 175 [66 Pac. 220] ; *Rutz* v. *Obear,* 15 Cal. App. 435 [115 Pac. 67] ; *Deming* v. *Maas,* 18 Cal. App. 330 [123 Pac. 204] ; *Minifie* v. *Rowley, supra.*) [6] The doctrine of corporate entity is not so sacred that a court of equity will hesitate to look through form to the substance of the thing and it may in proper cases ignore it to preserve the rights of persons imposed upon or circumvented by fraud. In such cases corporate fiction is disregarded. [7] So, in the instant case, as corporate entity was absolutely disregarded by H. C. Millsap in all of his transactions with the respondent, except in such respects as the requirements of law compelled him in order to accomplish his purposes to adhere to the forms of corporate procedure, he will not be permitted to defeat an action against himself for an accounting of property which came into his hands as the result of his unlawful methods merely because all the trustees of the defunct corporation, of which he was one, were not sued in conjunction with himself, when, as a matter of fact, he was the organizer and the manager and promoter of the scheme and project by which the fraud was committed.

[8] Appellant sustained a double trust relation to respondent. First, by force of the provisions of section 2224 of the Civil Code, which provides that "one who gains a

thing by fraud, accident, mistake, undue influence, the viola-
tion of a trust, or other wrongful act, is, unless he has some
other and better right thereto, an involuntary trustee of the
thing gained, for the benefit of the person who would other-
wise have had it.'' Second, *Metropolis Trust & Sav. Bank*
v. *Monnier,* 169 Cal. 592 [147 Pac. 265], restates the univer-
sal test which must be applied to every transaction between
attorney and client by which the attorney during the contin-
uance of his employment gains any advantage from his
client, in the following language:

''The relation of attorney and client is of a fiduciary char-
acter, and the Civil Code (sec. 2235) clearly provides that
all transactions between a trustee and his beneficiary during
the existence of the trust, by which he obtains any advan-
tage from his beneficiary, 'are presumed to be entered into
by the latter without sufficient consideration and under un-
due influence.' This does not mean that a trustee may not
deal with his beneficiary. But if he does deal with him in
such manner as to obtain an advantage, the trustee has the
burden of showing by evidence that the transaction was
fair.'' (See, also, *Sanguinetti* v. *Rossen,* 12 Cal. App. 623
[107 Pac. 560].)

That appellant gained an advantage from his client no
doubt can exist. That he did not meet the burden of show-
ing that the transaction was fair, which the law casts upon
him, is amply supported by the evidence set out in the
record.

[9] The commonplace maxims of equity, ''he who seeks
equity must do equity'' and ''he who comes into a court of
equity must come with clean hands'' have no application to
the facts adduced in the instant case. Certainly the law
will not hold a client *in pari delicto* with her attorney who,
acting under his influence and advice, places her property in
his name and possession for purposes of concealment. As
between the two the client is not, in the eyes of the law, as
culpable as the legal adviser. *Herrick* v. *Lynch,* 150 Ill.
283 [37 N. E. 221], lays down the true rule in such cases.
It is there said:

''We do not think, however, that under the circumstances
there should be an application of that rule of equity which
denies relief to one party against another when both have
been engaged in a fraudulent transaction. The parties were

not *in pari delicto*. One was legal adviser, the other client. The advice of the former being adopted, he procured title to the latter's interest in valuable real estate. Equity will not tolerate the idea that an attorney may make use of his peculiar power over his client to procure a contract which is illegal and contrary to public policy, and then invoke the aid of the law to enable him to retain that which he has obtained through his fraudulent artifices."

It was not intended by the conveyances made by respondent to said corporation that any beneficial interest in the property transferred or conveyed upon appellant's advice should pass or vest with the legal title thus conveyed. Such are the admissions of appellant.

[10] Appellant further contended that the trial court committed reversible error by refusing to accept as conclusive and binding the findings of the referee appointed by the court, with the consent of counsel, *to take and state the account of all transactions had between the parties thereto and each of them.* It was further stipulated that all exceptions or objections to the report or findings of the referee might be made by either party at the time of the trial with like effect as if a bill of exceptions had been prepared, settled, and allowed and filed in said action. The referee made his report from what was shown upon the face of certain books and documents and in doing so reported the transactions as existing between Mrs. Morgan and the M. M. Investment Company, making no mention of Homer C. Millsap, except as to the $20,000 promissory note. This gives rise to the claim that as the referee stated no account and made no report as to anything due the plaintiff from the Millsaps the court was thereby bound by what appeared upon the referee's report as to who the real parties to the equitable proceedings were. The referee was authorized only "to take and state the account of all transactions had between the parties hereto." Of course, this meant that he was only to furnish the court with a report as to what the books and accounts showed as to charges, receipts, and disbursements of every kind, and to account for property and funds, and did not authorize the referee to try all issues of fact and law and to report a finding and judgment thereon as provided by section 638, subdivision 1, of the Code of Civil Procedure. A referee was appointed to aid the court in the computa-

tion of accounts in the interest of time. We think the attitude of counsel clearly shows this to have been the understanding as shown by the objections made by counsel on both sides. The court went fully into the whole matter of the accounting. Section 644 of the Code of Civil Procedure is not controlling in the light of the circumstances of this case as the reference did not include both questions of fact and law and was not adopted by the court, and, therefore, was susceptible of vacation without the necessity of the granting of a new trial. (*Harris* v. *San Franicsco S. R. Co.*, 41 Cal. 393; 22 Cal. Jur. 698.) Besides, the report was not supported by evidence which was deemed satisfactory by the court and it had the inherent power to set it aside, as if it were a jury verdict. (*Cappe* v. *Brizzolara*, 19 Cal. 607.) We think the point must be decided against appellant on the theory that a clerical duty only was committed to the referee and he was not empowered to make findings on the issues not properly coming within his limited duty. The order of reference did not take the cause from the court and commit it to the referee for decision.

[11] The contention of appellant that he was entitled to a credit of $20,000 as and on account of an attorney's fee instead of $7,500, as allowed by the court, is a question of fact arrived at by the court upon a consideration of conflicting evidence which involves the unraveling of transactions intermingled with fictitious and fraudulent acts. The burden of showing that his dealings with his client in all respects were fair was upon appellant and he failed to satisfy the court of the justness of his claim. It is to be observed in this connection that a court may refuse to allow an attorney any sum as an attorney's fee if his relations with his client are tainted with fraud. ''Fraud or unfairness on the part of the attorney will prevent him from recovering for services rendered; as will acts in violation or excess of authority, and acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.'' (6 Cor. Jur. 722, 723.) But as opposing counsel did not object to the allowance of the sum of $7,500 as an attorney's fee and the court awarded that amount in full for all services performed, the order in that respect will be regarded as final.

197 Cal.—50

[12] The statute of limitations cannot be invoked in appellant's behalf. Respondent was practically an exile from her residence for a period of about five years, living a portion of the time in a foreign country under an assumed name upon the advice of appellant, and all information concerning the condition of her affairs was withheld from her on the theory that if her presence should be discovered she would be unable to furnish any information on supplemental proceedings as to her financial situation. This, at least, is the version of respondent. After her return to Los Angeles she was denied an inspection of the books and accounts of the corporation and refused information which she was entitled to receive.

[13] We have examined the findings, which are voluminous, and while there may be some slight inconsistencies, they are not so serious as to confuse the substantial issues. A reviewing court in such a case as this will not make its examination of a record so searchingly technical if fairly sustainable, as to overthrow a just judgment. [14] An officer of the court, such as an attorney, who finds himself enmeshed by the skeins which he has designedly woven to encompass another, will not be assisted by a court of equity from the peril of his position, if to do so would militate against the advantage of the client upon whom he had sinister designs.

The court found that plaintiff was entitled to recover the sum of $31,394.54, together with interest thereon, amounting to $17,693.11, from defendant H. C. Millsap, and the sum of $8,561.97, together with interest thereon, amounting to $2,114.82, from the defendant Bernice Williams Millsap, and it was ordered and adjudged that the sum of $10,676.79 of said judgment be joined as to said defendants Homer C. Millsap and Bernice Williams Millsap and that plaintiff have and recover costs.

Finding no reversible error in the record, the judgment appealed from is affirmed.

Richards, J., Waste, C. J., Shenk, J., Lawlor, J., and Lennon, J., concurred.