[Civ. No. 12031. Second Appellate District, Division One.—September 18, 1940.]

MINNIE M. MARR et al., Respondents, v. POSTAL UNION LIFE INSURANCE COMPANY (a Corporation). Appellant.

Euler & Subith, Louis J. Euler, Fred E. Subith, G. M. Gannon and Charles Callahan for Appellant.

Foster C. Phelps and Theodore W. Russell for Respondents.

WHITE, J.—This action was instituted by plaintiffs as trustees and as members of a bondholders' protective committee against defendants, Postal Union Life Insurance Company and Postal Underwriters, Inc. The litigation is predicated upon a nonnegotiable promissory note in the amount of $17,000, which note was received by plaintiffs as part of the consideration for the transfer by them of certain real estate known as the Royal Palms Hotel in the city of Los Angeles. The property in question was conveyed to defendant Postal Underwriters, Inc., and the note here sued upon was secured by 1700 shares of the capital stock of defendant Postal Union Life Insurance Company.

The complaint presented two causes of action, by the first of which it was alleged that defendant Postal Union Life Insurance Company (hereinafter referred to as the insurance company) was an undisclosed principal in the transaction, and that in the execution of the note defendant Postal Underwriters, Inc. (hereinafter referred to as the Underwriters), was, by virtue of precedent authorization, acting as an agent for the insurance company. The second cause of action charged that such agency was established by a subsequent ratification of the act of the alleged agent, the Underwriters. By its answer defendant insurance company denied any agency in connection with the transaction and further denied "that the execution and/or delivery of the said contract was the act of this defendant made and/or done through and/or by the said Postal Underwriters, Inc". Defendant Underwriters admitted the execution of the note, but denied liability for the full amount thereof, alleging negligence and bad faith in the proceedings attendant upon the foreclosure of the collateral security.

Briefly epitomizing the factual situation, it appears that prior to March 14, 1935, plaintiffs were the owners of that certain real property known as the Royal Palms Hotel. Defendant insurance company is a California corporation engaged in the life insurance business. Defendant Underwriters is also a California corporation, doing a small amount of brokerage business in the insurance field, but in the main devoting its activities to the holding of legal title to properties which were encumbered in favor of the insurance company. About March 1, 1935, one Starke and one Ringgold, real estate brokers, approached T. J. Olsen, controller of the insurance company and also vice-president of the Underwriters, and B. D. Malone, treasurer and general manager of the insurance company, with a view to promoting a sale of the Royal Palms Hotel property. Some days later Starke and Ringgold discussed the possibility of a sale of the property with plaintiffs, the then owners thereof. As a result of negotiations an agreement of sale was entered into between plaintiffs and defendant Underwriters on March 14, 1935, wherein plaintiffs agreed to sell the hotel property for the sum of $19,100 payable $2,100 in cash and the balance by a promissory note executed by the Underwriters for $17,000, said note to be secured by 1700 shares of stock of the insurance company. An escrow was thereafter opened, in which were deposited a deed from plaintiffs, a personal check of the aforesaid B. D. Malone in the sum of $4,100, and 1700 shares of the capital stock of the insurance company, to be used as security, and the nonnegotiable promissory note, the latter of which forms the basis of this action. On or about April 1, 1935, the deed was delivered to the Underwriters and plaintiffs received $2,100 in cash, the note, and the 1700 shares of stock. The balance of $2,000 remaining of the $4,100 aforesaid was paid by the purchasers as a brokerage commission. Three payments were made on the note in the total sum of $1765. Following default in payment, the pledged stock was sold at an alleged public pledge sale, upon which occasion it was purchased by the plaintiffs, who were the pledgees, for the sum of $10. It further appears that in June, 1936, an action was filed by the insurance company against the Underwriters and others to recover the Royal Palms Hotel property which had been deeded by the plaintiffs to the Underwriters on the theory that the Underwriters had acted in the transaction

above outlined as the agent of the insurance company. It was plaintiffs' contention that the allegations in the complaint in the last-named action constituted the first notice they had of the alleged relationship of principal and agent existing between the defendants in the instant action.' Thereafter the present lawsuit was filed by the plaintiffs herein.

Following trial before a jury a verdict was returned for plaintiffs in the sum of $11,235 plus $1123.50 attorney's fees, the same being the amount claimed by plaintiffs in their complaint less the sum of $5,000 which the jury found was the fair value of and should have been realized from the collateral at the alleged public sale aforesaid. From the judgment entered pursuant to such verdict defendant insurance company alone prosecutes this appeal.

Appellant first contends that this being an action based upon an agreement for the sale of real estate, wherein it is sought to hold an alleged undisclosed principal, parol evidence is not admissible to prove the agency. (Civ. Code, sec. 1624, subd. 4, and secs. 2307, 2309 and 2310; Code Civ. Proc., sec. 1973, subds 4 and 5.) The following special interrogatories were submitted to the jury:

"Was there any authority in writing or any note or memorandum thereof in writing and signed by the Insurance Company, given by the Insurance Company to the Underwriters to enter into the contract sued upon in this case?

"Was there any ratification in writing or note or memorandum thereof in writing and signed by the Insurance Company ratifying the acts of the Underwriters in entering into the contract sued upon in this case?"

The jury answered both questions in the negative. It follows from the foregoing, argues appellant, that since the jury found specially that there was no written evidence of the agency the verdict was based on parol evidence, or on the alleged *alter ego* relationship to which reference will hereinafter be made. However, appellant's claim that the statute of frauds is applicable in the instant case cannot be sustained. Where, as here, the contract sued upon had been completely performed by respondents, the aforesaid code sections cited by appellant have no application, and the appellant insurance company will not be permitted to avail itself of the statute of frauds to avoid liability on the contract. The reason for this rule is obvious in cases where, as here, respond-

ents believed, and under the facts of the case had a right to believe, they were dealing with the actual purchaser. ■

No citation of authority is required for the statement that it is the law that the contract of an agent who deals in his own name without disclosing that of his principal is the contract of the principal. (*Schnier* v. *Percival,* 83 Cal. App. 470 [256 Pac. 1109].) And where innocent third parties are led into dealing with an apparent principal they will be protected as against an undisclosed principal who is the actual purchaser when the latter has permitted the agent to hold himself out as the principal with full power to contract. The rights of such innocent parties in such a situation do not depend upon the *actual authority* of the party with whom they directly deal, but arise from the conduct of the real principal by which he is precluded from disputing, as against them, the existence of authority which he has allowed to be vested in the party with whom they are dealing. (*Duerr* v. *Sloan,* 40 Cal. App. 653 [181 Pac. 407] ; *Colquhoun* v. *Pack,* 32 Cal. App. 97 [161 Pac. 1168] ; *Geary St. etc. R. R. Co.* v. *Rolph,* 189 Cal. 59 [207 Pac. 539].) In other words, the authority of the agent under the facts here present rests upon the theory of estoppel. Where, as in the instant case, there has been full performance upon the part of the party seeking to enforce the contract, the doctrine of estoppel arises, and when it does arise no writing is required because the courts will not permit a litigant to use the statute of frauds as an instrument with which to perpetrate fraud or oppression. Respondents believed, as they had a right to believe, at the time the transaction was consummated, that they were dealing with the Underwriters as principal. Consequently respondents could not be expected to inquire as to the existence of written authority to the agent when they had no knowledge that the Underwriters was anything but the principal. For the protection of innocent parties it is ordained that where a contract made by one who is alleged to be the agent of another is required to be in writing and there was no written authorization for the alleged agent to execute such contract, the alleged undisclosed principal may be estopped from setting up the lack of written authorization of his agent as a defense to the action of a third party to the contract when the latter has fully performed upon his part. (*Corporation of America* v. *Harris,* 5 Cal. App. (2d) 452 [43 Pac. (2d) 307] ; *Laack* v. *Dimmick,*

95 Cal. App. 456 [273 Pac. 50].) Therefore the trial court committed no error in admitting parol evidence in determining the question of agency and instructing the jury as to the effect of such evidence.

We do not find in the record any substantial evidence to support appellant's contention that respondents elected to hold the Underwriters as agent rather than the insurance company as principal. The interest of respondents in obtaining a financial statement of the affairs of the insurance company was but natural when the collateral offered by the Underwriters to secure payment of their note consisted of stock in the insurance company. Nor was the conduct of the brokers who negotiated the sale of the property binding on respondents.

We come now to a consideration of appellant's contention that the court erred in admitting evidence over its objection when such evidence was offered in support of respondents' claim that in the transaction under investigation the Underwriters was the *alter ego* of appellant insurance company. In this connection it is first urged that such proof constituted a fatal variance between the allegations of the complaint and such proof. We think not. By its answer appellant insurance company denied that the execution and delivery of the note was its act, performed by or through the instrumentality of its codefendant, Underwriters. By such denial appellant challenged proof that it was in any way connected with the execution and delivery of the note by the Underwriters. The genesis of the action as set up by the complaint was that appellant executed the promissory note by authorizing the Underwriters as its agent so to do, or that such act on the part of the Underwriters was later ratified by the insurance company. Any omission in the complaint with reference to *alter ego* was sufficiently cured by the aforesaid express denial as contained in the answer. (*Sebring* v. *Harris,* 20 Cal. App. 56 [128 Pac. 7]; *Perkins* v. *Blauth,* 163 Cal. 782 [127 Pac. 50]; *Bledsoe* v. *Stuckey,* 47 Cal. App. 95, 96 [190 Pac. 217]; *Vance* v. *Anderson,* 113 Cal. 532 [45 Pac. 816].) That appellant was not, as claimed, taken by surprise through the introduction of the issue of *alter ego* into the trial is strongly indicated by the opening statement of appellant's counsel to the jury, wherein he said: " . . . B. D. Malone organized the Underwriters for the purpose of hold-

ing this real estate and for the purpose of transacting his other business; and instead of being the *alter ego* of a life insurance company, which it could not be under the law, it was the *alter ego* of B. D. Malone. . . . I am here representing the Postal Union Life Insurance Company, and we are entirely distinct and separate in this case, and the two corporations have no connection whatever, *and the proof will show you that,* and the proof will show you that they never did have any connection except that B. D. Malone, true, at one time controlled the Postal Underwriters, and also owned the controlling stock in the Postal Union Life Insurance Company. . . . '' The foregoing immediately suggests that appellant's counsel was not surprised or misled by presentation of the *alter ego* theory at the trial, but on the contrary was fully prepared to meet such issue and defend against it. Not having actually misled appellant to its prejudice in presenting its defense, the variance, if any, between the allegations of the complaint and the proof cannot be considered as a material variance. (Code Civ. Proc., secs. 469, 470.)

We are now confronted with the question raised by appellant as to whether the evidence submitted on the issue of the Underwriters' being the *alter ego* of the insurance company was sufficient to justify the action of the trial court in submitting that question to the jury, and further, whether such evidence was sufficient to support an affirmative verdict based thereon. What we shall have to say in that regard will also serve to determine the sufficiency of the evidence to sustain the existence of an agency between the two corporations. Before the courts will disregard the corporate entity of one corporation and treat it as the *alter ego* of another, even though the latter may own all the stock of the former, it must further appear that there is such a unity of interest and ownership that the individuality of the one corporation and the owner or owners of its stock has ceased, and further, that the observance of the fiction of separate existence would under the circumstances sanction a fraud or promote injustice. In other words, bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence. (*Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service,* 217 Cal. 124 [17 Pac. (2d) 709]; *Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 Pac. 641]; *Stanford Hotel Co.* v. *M. Schwind Co.,* 180 Cal. 348 [181 Pac.

780]; *Sunset Farms, Inc.,* v. *Superior Court,* 9 Cal. App. (2d) 389 [50 Pac. (2d) 106].)

■ With these principles in mind, let us examine the evidence as to interlocking relations existing between the corporations whose status as independent entities is here in question. No stock of the Underwriters was ever issued. M. L. Malone, wife of B. D. Malone, was its president, and the latter owned or controlled approximately 20,000 of the total 25,000 outstanding shares of stock in the insurance company. The jury was not required to believe the testimony of W. R. Malone to the effect that he was holding 13,000 shares of B. D. Malone's insurance company stock as collateral security with power of voting the same, because the conduct of B. D. Malone in the management of the affairs of the insurance company at all times justified a conclusion contrary to the testimony of W. R. Malone. The evidence further warrants the conclusion that B. D. Malone controlled the insurance company, while his wife was president of the Underwriters. While the fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an *alter ego* relationship upon its part, nevertheless it does indicate that such corporation may exist merely to serve the interests of another—a corporation or an individual. (*Shorb* v. *Beaudry,* 56 Cal. 446, 450; *Clark* v. *Millsap,* 197 Cal. 765, 779 [242 Pac. 918].) In his opening statement counsel for appellant declared: " . . . B. D. Malone came in and bought the stock of the Postal Union Life Insurance Company from this other group, and in order to hold the title to this real property he organized this Postal Underwriters. Now, that was his company. . . . " The reason for this, said appellant's counsel, was "because a life insurance company can't hold real property under the law". (Ins. Code, sec. 1150.) During the presentation of its defense herein appellant attempted to show that the Underwriters was an active insurance broker in its own right, and that the brokerage business was one of the principal purposes of its existence, but such effort was feeble, indeed. The proof indicated that its brokerage business was extremely meager. In fact, the commissions earned therefrom never exceeded $57.30 in any one month, and they varied in amount from that figure to as low as $7.29 per month. Further, the evidence showed that the assets of the Underwriters consisted almost exclusively of

equities in some 107 parcels of real property, practically all of which real properties were incumbered in favor of the insurance company. The fact that a corporation has no real or independent business of itself, of course, is of some importance in determining whether it is used simply as a conduit through which to conduct the business of another. (*Eldridge* v. *Mowry,* 24 Cal. App. 183, 185 [140 Pac. 978] ; *Clark* v. *Millsap, supra.*)

It is further in evidence that while T. J. Olsen was vice-president and a director of the Underwriters and in active charge of its affairs, he received no compensation from the Underwriters for these services until about May, 1935, which was subsequent to the transaction now before us. From December, 1934, to June, 1935, Olsen was paid a salary of $200 per month by the insurance company of which he was controller, while his duties consisted of looking after the interests of the insurance company in the properties acquired by the Underwriters. Lois Mercer was a secretary employed by the insurance company, yet she performed stenographic services for the Underwriters as needed, and when her work for the latter corporation increased she moved to quarters occupied by it adjacent to the insurance company's executive offices. Her salary was paid exclusively by the insurance company, and the Underwriters paid her nothing during the period here under consideration. In fact, no officer of the Underwriters, except Olsen after the date above specified, was ever paid a salary by the Underwriters. Thus we find a situation where all active workers promoting the interests of the Underwriters did so actually as the paid employees of the insurance company. Prior to and at about the time of the transaction here involved, the books of account of the Underwriters consisted only of a cash book showing receipts and disbursements. It is also noteworthy that the two corporations during the first six months of 1935 employed the same attorney, a fact entitled to consideration in determining the question of *alter ego.* (*Kelly* v. *Ning Yung Ben. Soc.,* 2 Cal. App. 460, 463 [84 Pac. 321] ; *Mirabito* v. *San Francisco Dairy Co.,* 8 Cal. App. (2d) 54, 59 [47 Pac. (2d) 530].) The insurance company owned the building in which both corporations officed, the business office of the Underwriters being adjacent to the executive offices of the insurance company, and the Underwriters paid no office rent. The furniture and equip-

ment in the office of the Underwriters' secretary was owned by the insurance company, while a common PBX board was used in handling the telephone service for both corporations, for which service the Underwriters paid nothing. Such use of common offices by two corporations is regarded as indicating, or at least supporting, a conclusion that one is the *alter ego* of the other. (*Eldridge* v. *Mowry, supra; Mirabito* v. *San Francisco Dairy, supra; Higgins* v. *California Petroleum etc. Co.,* 122 Cal. 373 [55 Pac. 155]; *Abney* v. *Belmont Country Club,* 100 Cal. App. 12 [279 Pac. 829]; *Sunset Farms, Inc.,* v. *Superior Court, supra.*)

Appellants contend that there appears in the record evidence of sufficient substantiality, if believed, to warrant the conclusion that in the instant transaction the Underwriters, as agent for its undisclosed principal the insurance company, was to obtain title to the Royal Palms property in consideration of the payment to respondents of $4,100 and further obligating itself on a promissory note for an additional $17,000; thereupon the Underwriters were to or did in fact execute a $90,000 obligation in favor of the insurance company, with the Royal Palms Hotel as security. In exchange therefor the insurance company was to deliver to the Underwriters about $38,000 in trust deeds upon a number of small properties, which trust deeds were held by the insurance company. That the Underwriters would sell these small trust deeds for approximately $30,000, which would leave the Underwriters a profit of $7,000 or $8,000 above the $21,100 paid by it to respondents for the Royal Palms property. That as a result of these transactions the insurance company, having received a $90,000 trust deed in exchange for $38,000 in small trust deeds, would show a book profit of approximately $52,000. Upon reflection, however, such an arrangement does violence to reason and sorely taxes credulity when analysis reveals that under the aforesaid plan the Underwriters would have paid out $21,100 for the property, then obligated itself to pay $90,000 more, or a total obligation of $111,100, all to obtain $38,000 in trust deeds. In other words it is difficult to believe that the Underwriters magnanimously agreed with the insurance company to engage in a deal by which the Underwriters would suffer a loss of $73,100. We feel therefore that the jury was justified in concluding that

these two corporations were not dealing with each other at arm's length, but on the contrary, it was never intended that these reciprocal obligations should be paid by one to the other, but were merely obligations undertaken by the corporations themselves to themselves as one organization for the purpose of building up the apparent or book financial condition of the insurance company, in which scheme the Underwriters was merely the *alter ego* of the insurance company.

As further evidence of the relationship existing between the two corporations, there was offered at the trial an original and two amended complaints filed by appellant insurance company against the Underwriters and others in connection with the acquisition of the Royal Palms property by the Underwriters. In the original complaint appellant alleged directly and unequivocally that the Underwriters held title to the Royal Palms property for the insurance company; that the insurance company arranged to have $4,100 advanced to the Underwriters to consummate the transaction with respondents; that the Underwriters agreed to execute a $90,000 trust deed in favor of appellant insurance company upon the Royal Palms property; that the transaction was authorized by resolution of the board of directors of the insurance company; that the taxes on the property were paid on behalf of the insurance company by its president. Then follow allegations as to the manner in which the $90,000 trust deed and the equitable title to the hotel property were lost by the insurance company. This litigation was finally compromised. True, the last-mentioned evidence and exhibits were excluded by the trial court, but such exclusion was erroneous. The evidence was competent and material. It should have been admitted. It went far toward proving a ratification by the insurance company of the acts done by its agent in the latter's dealings with respondents.

The foregoing recital of the evidence convinces us that there were here present all the necessary elements to constitute an *alter ego* relationship between the two corporations, namely, (1) control of one by the other; (2) that one was but the mere conduit of the business of the other; (3) that recognition of the separate existence of the Underwriters would sanction a fraud and permit oppression and injustice. We entertain no doubt that the evidence clearly shows that the Underwriters had no real genuine interest in the Royal Palms

property; that all it possessed was the naked legal title, held by it for the insurance company. (*Shea* v. *Leonis*, 14 Cal. (2d) 666 [96 Pac. (2d) 332]; *Clark* v. *Millsap, supra; Higgins* v. *California Petroleum etc. Co., supra,* 376; *Lost Burros Gold Min. Co.* v. *Inyo County Bank,* 83 Cal. App. 679 [257 Pac. 209].) The jury was the judge of the value and effect of evidence challenging the verity of the testimony here narrated.

■ Appellant next complains of the giving of certain instructions and the refusal to give others. It would unduly prolong this already lengthy opinion to set forth the challenged instructions given and the proffered instructions rejected. Suffice it to say that a reading of all instructions given satisfies us that the jury was adequately, correctly and fairly instructed upon all issues tendered by the pleadings or raised by the evidence. And we might add that under the facts of this case as revealed by the evidence, even though it should be conceded that the giving or refusing of certain instructions was erroneous, nevertheless section 4½ of article VI of the Constitution and section 475 of the Code of Civil Procedure restrains us from reversing the judgment, because we would not be warranted in saying that a different verdict would probably have been rendered had such errors not occurred.

■ Upon the oral argument of this cause appellant contended that the contract between respondents and it through the Underwriters was illegal and void for the reason that the same contravened the provisions of section 1150 of the Insurance Code. Because it was raised for the first time at the oral argument and subsequent to the filing of all briefs, in the latter of which it was not referred to at all, we cannot give consideration thereto. ■ However, we might say that the inhibitions of section 1150 of the Insurance Code may have furnished the motive for appellant's doing what the jury found it did, viz., utilizing the Underwriters as a business conduit to hold title to real property, which under the law the insurance company was prohibited from doing. Being an undisclosed principal so far as its transactions with respondents were concerned, the insurance company should not now be permitted to escape liability on the ground that the contract it caused to be made through its *alter ego* with

respondents was illegal and unlawful so far as the obligations of the insurance company thereunder were concerned.

The judgment should be affirmed, and it is so ordered.

York, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 7, 1940.