242 F.2d 435
 John Lucas HUDSON, Sr. and Pacific-Palmdale Development Company, a corporation, Appellants.
v.
William A. WYLIE, as Trustee in Bankruptcy of the Estate of John Lucas Hudson, Sr., a bankrupt, Appellee.
 No. 15110.
 United States Court of Appeals Ninth Circuit.
 March 1, 1957.
 Rehearing Denied April 11, 1957.
 
 1
 Merrill L. Granger, Santa Monica, Cal., for appellants.
 
 
 2
 Craig, Weller & Laugharn, Thomas Tobin and William E. Bartley, Los Angeles, Cal., for appellee.
 
 
 3
 Before BONE and BARNES, Circuit Judges, and ROSS, District Judge.
 
 
 4
 ROSS, District Judge.
 
 
 5
 This is an appeal from an order of the District Court, Southern District of California, Central Division, affirming on review Findings of Fact, Conclusions of Law, and Order of a Referee in Bankruptcy. This case has an interesting background.
 
 
 6
 To make this opinion understandable a somewhat lengthy statement of the case history must be given. John Lucas Hudson, Sr., filed a voluntary petition in bankruptcy on April 19th, 1954, and on that date was adjudged a bankrupt. He has at all times been represented in this bankruptcy matter by one Merrill L. Granger.
 
 
 7
 As the brain child of Hudson and Granger the Pacific Palmdale Development Company (hereinafter called "Palmdale") came into being after numerous conferences and discussions, the tenor of which were how to capitalize Hudson's capabilities, make some profitable deals, and at the same time protect the profits of the insolvent Hudson against his creditors.
 
 
 8
 Hudson was and is a skilled "mass production" builder in the construction field. Merrill L. Granger, who represents Hudson in this matter, as well as the pending bankruptcy, is one of the actors. Granger is an attorney with considerable experience in the "insolvency" and bankruptcy field of law. He had in years past represented members of the Hudson family, and prior to the immediate events appeared to be family counsellor, without portfolio. He fully appreciated Hudson's financial difficulties and was well aware of his capabilities as a building contractor. To use the vernacular both Hudson and Granger knew their way around. Having with this foreword set the stage we will present sufficient of the factual background to give an appreciation of the more subtle points here involved.
 
 
 9
 For reasons unknown a former building venture "went sour" and Hudson found himself owing his creditors around $300,000.00, and in late 1953 or early 1954 he made an assignment of assets to his creditors which, so far as we can ascertain, amounted to little or nothing. The creditors did not release Hudson from his liabilities and obligations. Granger regretted to see his friend in such a situation, and as he testified —
 
 
 10
 "I did give him advice in connection with his relation to creditors at that time but it was after an affirmation, reaffirming of advice that I had earlier given him, probably very early in the year.
 
 
 11
 "It was mine (the idea for the creation of Pacific Palmdale Development Company), it took birth this way: It had come to my attention that Mr. Hudson had made an assignment for the benefit of creditors, and I had met him and he discussed the fact of his assignment, and expressed some apprehension as to how he was going to get started in business again.
 
 
 12
 "At that time I told him that I would like to plan a method of exploiting his experience and his skills, and I wanted to know particularly then whether if I do so his services would be available to me in anything that I set up, and he said they would.
 
 
 13
 "That if he would undertake from his earnings, substantial earnings, to build some fund to use in financing his independent operations before he obtained a release from his creditors, or before he obtained a discharge in bankruptcy, the accumulation that he would make would be subject to their demands. That was reiterated to Mr. Hudson on occasion." (267)
 
 
 14
 The plans progressed, the first step being the preparation and execution of a "sole trader" agreement between Hudson and his wife permitting her to engage in the construction business and to retain the profits as her separate property. Mrs. Hudson, the record indicates, was a housewife, with no special skills.
 
 
 15
 Granger, under the nom de plume of Sierra Construction Company, wrote to the Commodity Credit Corporation, and requested information on "grain bin" projects. It appears that in this specialized area Hudson was already particularly experienced, both in the methods required to obtain such a type of contract, and in the fabrication and erection of the bins themselves.
 
 
 16
 During this period, March, 1954, Granger hit upon the Palmdale area near San Diego in Southern California as an area where a mass building project might be undertaken. The matter was discussed between Hudson, Granger, and one Bloom, who was a friend of the family and who was also interested in real estate and building. The three of them made several trips to Palmdale to look over possible building sites. During this period of time, March of 1954, the Pacific Palmdale Development Company, a corporation, was conceived and organized for the ostensible purpose of carrying on the Palmdale building venture. This was necessary to protect Hudson who by reason of his assignment to creditors, and insolvent condition could not openly participate in any venture that would return personal profits. As set-up the interests in the Palmdale Corporation were as follows: Hudson's wife 44%, Hudson's son 44%, Granger 12%. On April 3rd the articles were mailed to the Secretary of State and on April 6th the certificate of incorporation was issued. The corporation at no time issued any stock, had no property or funds, entered into no business transactions, and its existence was limited to and is important only in relation to the matter under discussion here, the joint venture agreement for the construction of the grain storage bins hereinafter more particularly explained.
 
 
 17
 At about this time Granger, as Sierra Construction Company, received in answer to his former inquiry, an invitation from the Commodity Credit Corporation to bid on the construction of certain grain storage bins in the mid-west. Interest was immediately transferred from the Palmdale venture to the grain bin deal. Also, about this time, the contemplated building venture at Palmdale "washed out", and Bloom withdrew from the Pacific-Palmdale Corporation, leaving only Hudson's wife, his son, and Granger.
 
 
 18
 Now to the (1) joint venture agreement, and (2) the contract with the Commodity Credit Corporation for the building of surplus grain storage bins. Having received the invitation to bid Granger and Hudson were interested in "teaming up" with someone who might finance such a deal in the event it was possible to obtain such a contract.
 
 
 19
 On or about April 3, 1954, Hudson and one Lloyd Russell Reeve made contact. Reeve was a financially sound contractor. In the conversations that took place Hudson advised Reeve of his past experience and success in grain bin ventures, and presented the files of his former transactions with the Commodity Credit Corporation to back him up. Reeve had no experience in this field but became "sold" by Hudson. Thereupon the parties discussed a "joint venture" agreement, and for the first time Reeve learned of Pacific-Palmdale Development Corporation.
 
 
 20
 In the early part of April when the discussions concerning the grain bin deal and the joint venture were taking place Hudson advised Reeve that he, Hudson, was the company. The following is a portion of Reeve's testimony:
 
 
 21
 "Q. Did you discuss who the parties on the contract (joint venture) would be? A. No, it was about that time that the Pacific-Palmdale Development Corporation got into the picture, and I asked who they were.
 
 
 22
 "Q. Who mentioned the Pacific-Palmdale Development Corporation? A. Mr. Hudson.
 
 
 23
 "Q. What did he say in that connection? A. Well, he said something about the Pacific-Palmdale Company. I said who is the Pacific-Palmdale Development Company.
 
 
 24
 "Q. What was his answer? A. To my best recollection he said that he was the Pacific-Palmdale Company, a corporation; that he had a Mr. Phil Bloom and a Mr. Merrill Granger who was an attorney * * * Mr. Granger was an attorney and he was paying him 12½% of every cent he made in that capacity.
 
 
 25
 * * * * *
 
 
 26
 "Q. Mr. Reeve, did at any time prior to the execution of this agreement, Mr. Hudson make any representation as to the ownership of the Pacific-Palmdale Development Company, as to who owned the company? A. Yes, he said he owned it. * * * Well, the conversations regarding — concerning Mr. Hudson's ownership of the Pacific-Palmdale was the fact — if I have to say it, I will say it. It was that this Pacific-Palmdale Development Company was a corporation that he had organized to benefit himself.
 
 
 27
 "Q. Did he state that to you? A. Yes * * *"
 
 * * * * *
 
 28
 "Q. What was the conversation which occurred between the two of you at that meeting of April 4th? A. That he (Hudson) wanted me to go ahead with him and finance the grain bin deal or this deal.
 
 
 29
 "Q. Now in return for your services of financing, did Mr. Hudson agree to perform any services himself? A. Yes.
 
 
 30
 "Q. And what did he say regarding that? A. Well, he had all the experience and he was going to put the experience into the deal, if I would finance it."
 
 
 31
 As a result of conversations between Reeve and Hudson a joint venture operation was blueprinted, and became the finalized joint venture agreement entered into between Reeve, Inc. and Palmdale. During the discussions Hudson mentioned to Reeve that the joint venture agreement would be with Pacific-Palmdale Development Corporation, that he (Hudson) was the company, that it was a corporation he had organized to protect himself. In the actual drafting of the agreement, Hudson, and/or Palmdale, was represented by Granger. It provided in part:
 
 
 32
 "That the availability of the said John L. Hudson by the party of the second part is one of the inducing considerations for the party of the first part (Reeve, Inc.) entering into this joint adventure * * * and the party of the second part (Palmdale) shall make available to the party of the first part the services of the said John L. Hudson for such time as may be reasonable and necessary to procure and perform any such contracts from the Commodity Credit Corporation."
 
 
 33
 Hudson and Reeve enplaned for Washington, D. C., the evening of April 6th, taking the drafted joint venture contract with them, which as yet neither had examined in final form. This was done in Washington the next day and Hudson conferred with Granger by phone concerning the same. Granger advised him to execute the agreement on behalf of Palmdale, as treasurer. The joint venture contract was accordingly executed by Hudson as treasurer of Palmdale, and Reeve as president of Reeve, Inc., on April 7th. Hudson and Reeve then spent several days in Washington working on the bid plans and specifications and on April 9th, a bid was filed with the Commodity Credit Corporation. This was prepared on Hudson's former experience in like contracts and under similar bidding conditions. Hudson and Reeve then immediately returned to California.
 
 
 34
 On April 6th, on the evening of which day Hudson and Reeve left for Washington, Granger forwarded the previously executed articles of incorporation of Palmdale to the Secretary of State.
 
 
 35
 On April 9th or 10th immediately after Hudson's return from Washington, Granger began to prepare Hudson's petition in bankruptcy. It was filed on April 19th, and Hudson was adjudicated a bankrupt on that date, and listed creditors to the extent of $350,000.00. Reeve did not become aware of this until some time later. On April 20th the board of directors of Palmdale authorized the payment to Hudson of the first $50,000.00 to be received from the joint venture. Through a side agreement with Hudson, in addition to the 12% ownership in Palmdale Corporation, Granger was to receive 12% of all moneys Hudson personally received.
 
 
 36
 On April 17th two days prior to the filing of the petition in bankruptcy which was on the 19th, Commodity Credit Corporation conditionally accepted the joint venture grain bin bid. On April 19th, the day Hudson was adjudicated a bankrupt the conditional acceptance was confirmed by the joint venture firm of Palmdale and Reeve, Inc.
 
 
 37
 The grain bin deal got under way and moneys were received by the joint venture association from the Commodity Credit Corporation. Out of the first moneys received $1,000.00 was paid outright to Hudson, ostensibly to cover the expense of his trip to Washington, and two subsequent payments of a total of $20,000 were also made to Hudson pursuant to resolutions of Palmdale's board of directors authorizing the same to be done.
 
 
 38
 Some time after this the trustee in the bankruptcy matter learned of the joint venture agreement and the grain bin deal with the Commodity Credit Corporation. Wylie, the trustee, then filed a petition with the referee in bankruptcy requiring the bankrupt, Hudson, to account. The prayer asked that Hudson, the bankrupt, be required to show cause why the Referee should not enter an order (1) declaring and decreeing that Palmdale was the alter ego of Hudson; (2) that all profits realized under the contract of April 7, 1954, the joint venture association, were assets of the bankruptcy estate; (3) that the bankrupt, Hudson, pay over to the estate all sums of money which he had received as a result of the grain bin deal paid to him on the resolution of the board of directors of Palmdale; and (4) to restrain a suit then pending in the state court between Palmdale and Reeve, Inc. in which Palmdale was seeking an accounting as to further profits made in the deal. The Referee issued his order to show cause. Granger on behalf of Hudson and Palmdale filed an answer. The matter was heard by the Referee who entered his Findings of Fact (fifty-one in number), Conclusions of Law, and Order. Finding XLVII was to the following effect:
 
 
 39
 "That the aforementioned contract of April 7, 1954, (the contract of the joint venture association and the Commodity Credit Corporation), and the drafting thereof, were made and executed by and with the specific intent of the bankrupt, John Lucas Hudson, Sr., and his attorney, Merrill L. Granger, to hinder, delay, defraud, and cheat the creditors of John Lucas Hudson, Sr., with specific knowledge on the part of John Lucas Hudson, Sr., and Merrill L. Granger that the said contract of April 7, 1954, would have the effect to hinder, delay, defraud and cheat the creditors of John Lucas Hudson, Sr., and the said contract of April 7, 1954, did have the actual effect of hindering, delaying, defrauding and cheating the creditors of John Lucas Hudson, Sr."
 
 
 40
 The Referee drew fourteen Conclusions of Law from the Findings of Fact, concluding that Pacific-Palmdale Development Company at all times was "a hollow shell" controlled and dominated by Hudson "and is the alter ego of John Lucas Hudson, Sr.; that the contract between the Commodity Credit Corporation and the joint venture association was in fact a contract with Commodity Credit Corporation and Lloyd R. Reeve, Inc. and John Lucas Hudson, Sr.; that all moneys realized thereunder were the assets of the bankruptcy estate; that Palmdale was incorporated by Hudson and Granger with the `specific intent' to hinder, delay, defraud and cheat Hudson's creditors, and to conceal assets from the creditors." Further —
 
 
 41
 "* * * that there is such a unity of interest and ownership between the said John Lucas Hudson, Sr., and the Pacific Palmdale Development Company that the individuality or separateness of the said John Lucas Hudson, Sr., and the Pacific Palmdale Development Company has ceased to exist and the facts are such that an adherence to the fiction of the separate existence of the corporation would under the circumstances of this action sanction a fraud or promote an injustice, and it is hereby found that the Pacific Palmdale Development Company has no existence whatever separate and apart from John Lucas Hudson, Sr."
 
 As a part of his Order the Referee held:
 
 42
 "It is further ordered that all assets arising by, under or by virtue of the contract of April 7, 1954, whether prior or future, are assets of this estate and that Philip Bloom, Blanche V. Hudson, William Hudson, the Pacific Palmdale Development Company and/or Merrill L. Granger have no right, title, and interest whatever in and to the said assets. It is further ordered that John Lucas Hudson, Sr., the within bankrupt, is indebted to this estate in the sum of $21,000."
 
 
 43
 Granger, then, on behalf of Palmdale filed a petition for review of the Referee's Findings of Fact, Conclusions of Law, and Order; the Referee sent the record and his certificate on review up to the District Court, and on review the District Court entered its order affirming the Referee's Order of December 6, 1955. The present appeal is taken from the order of the District Court. We have now made full circle.
 
 
 44
 Under their "specifications of error" appellants assert that the Court erred in that Findings of Fact VII and XLVII are not supported by the evidence; that Findings of Fact XXIV, XLV, XLVI and XLVIII are contrary to and not supported by the evidence.
 
 
 45
 Based on a careful review of the entire record in this case we conclude that each and every one of the Findings of Fact referred to are consistent with, and are supported by, the evidence, and that aplants' specification of errors numbered 1 to 7, inclusive, are without merit.
 
 
 46
 Specification of Error 8 to the effect that the court erred in not finding certain additional facts we also find to be without merit. Specification 9 holds that "each" of the Conclusions of Law except those numbered V and XII are against the law and the evidence. We hold that there is no merit to this specification.
 
 
 47
 Finally it is said, Specification 10, that the court erred in approving and confirming the Referee's decision of December 6, 1955. It is our opinion that the court's approval of the Referee's decision was proper and is supported by the record, and the law.
 
 
 48
 Appellee takes the position, and we think correctly, that the only issues here involved are two, namely:
 
 
 49
 1. Whether or not Pacific-Palmdale Development Company was the alter ego of the bankrupt, Hudson; and
 
 
 50
 2. Whether or not the assets earned under the joint venture contract between Pacific Palmdale Development Company and Lloyd R. Reeve, Inc. are assets of this bankrupt estate.
 
 
 51
 We take up first the problem of alter ego. Appellants urge that Pacific-Palmdale Development Company is not Hudson's alter ego; that no inquiry can be made into the question of corporate alter ego if no fraud or inequitable position is being shielded thereby; that there can be no actionable fraud without damage and creditors cannot be defrauded of that to which they are not entitled.
 
 
 52
 In our opinion the record fully supports appellee's position that Pacific-Palmdale was organized solely for the purpose of defrauding the creditors of the bankrupt, Hudson. Having given a rather detailed résumé of the evidence no further comment is necessary as to how or why we arrive at our conclusion. The record speaks for itself. It is quite apparent that the corporation was nothing more than a "front" through which Hudson might again engage in business permitting him to write off some $350,000.00 of indebtedness, and at the same time keep and enjoy all profits received behind the curtain of the sham corporation.
 
 
 53
 The record fully supports the proposition that the joint venture contract was not for work or labor but rather for the skill and experience possessed by Hudson; that this was the consideration for the joint venture agreement which came into existence by the execution of the contract on April 7th, some twelve days prior to the adjudication in bankruptcy on April 19th, that the major and vital part of Hudson's skill, experience and services was directed to the preparation of the bid and the securing of the contract from the Commodity Credit Corporation, and was performed immediately prior to the time of the filing of the initial bid with the Commodity Credit Corporation on April 9th; that from there on out any experienced construction man might have successfully brought about the fabrication and actual construction of the grain storage bins. It is obvious that Pacific-Palmdale Development Corporation was and is the alter ego of Hudson; that as of April 19th, on which date Hudson was adjudicated a bankrupt, he had a vested interest in, was the real party in interest in the joint venture contract with Commodity Credit Corporation, and was entitled to share in the profits to be derived therefrom.
 
 
 54
 On the question of alter ego it was said in Katenkamp v. Superior Court, 16 Cal.2d 696, 700, 108 P.2d 1, that it is not necessary that actual fraud be shown. It was sufficient if a refusal to recognize the fact of the identity of corporate existence with that of the individual would bring about inequitable results.
 
 
 55
 In Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 61 S.Ct. 904, 907, 85 L.Ed. 1293, the Supreme Court had before it, in certiorari from the Ninth Circuit, a situation similar to the one presented here, a family corporation. In the course of its opinion the court said:
 
 
 56
 "Mere legal paraphernalia will not suffice to transfer into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket. Whatever the full reach of that rule may be, it is clear that a family corporation's adverse claim is merely colorable where, as in this case, the corporation is formed in order to continue the bankrupt's business, where the bankrupt remains in control, and where the effect of the transfer is to hinder, delay, or defraud his creditors. In re Schoenberg, 2 Cir., 70 F.2d 321; In re Berkowitz, D.C., 173 F. 1013. * * * Cf. Shapiro v. Wilgus, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355."
 
 
 57
 In our case Hudson owned no stock in the corporation, none being issued. But it appears that his wife and son held an 88% ownership in the company.
 
 
 58
 The Wenban Estate v. Hewlett case, 193 Cal. 675, 227 P. 723, 731, has been cited many times, one of the more recent cases in which it is cited with approval, being Duarte v. Postal Union Life Insurance Co., 75 Cal.App.2d 557, 171 P.2d 574, 585:
 
 
 59
 "While it is the general rule that a corporation is an entity separate and distinct from its stockholders, with separate, distinct liabilities and obligations, nevertheless there is a well-recognized and firmly settled exception to this general rule, that, when necessary to redress fraud, protect the rights of third persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.
 
 
 60
 "Accordingly, it has been held that upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate capital stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation."
 
 
 61
 In Marr v. Postal Union Life Insurance Co., 40 Cal.App.2d 673, 105 P.2d 649, 654, the court said:
 
 
 62
 "While the fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an alter ego relationship upon its part, nevertheless it does indicate that such corporation may exist merely to serve the interests of another — a corporation or an individual. Shorb v. Beaudry, 56 Cal. 446, 450; Clark v. Millsap, 197 Cal. 765, 779, 242 P. 918."
 
 
 63
 Appellants argue that the fund from which the bankrupt was to be paid for his services did not exist actually or potentially on April 19th, 1954; that wages may not be assigned when they are to be earned under a contract which is merely possible at the time of the assignment; that the earnings of the bankrupt in the grain bin deal were subject to his contract as his property and did not belong to his trustee in bankruptcy.
 
 
 64
 Our comment on the foregoing is as follows: The joint adventure agreement was one for the contribution of skills and experience, and not for labor or personal services as the expression is ordinarily used; that the contract with the Commodity Credit Corporation came into existence on April 17, or in any event on the 19th, on which date Hudson was not entitled to wages but had the right to participate in the profits of the joint venture; that on April 17, or in any event not later than the 19th, on the date of his adjudication in bankruptcy, Hudson had a vested interest in the contract between the Commodity Credit Corporation and the joint venture association; that this was an assignable interest and passed to the trustee in bankruptcy for the benefit of creditors; that Hudson's interest in such contract had, if not a fixed and liquidated value, an ascertainable and calculable value as of that date.
 
 
 65
 Wages, say appellants, may not be assigned when they are to be earned under a contract which is merely possible at the time of the assignment. We have answered this by finding that Hudson was not entitled to wages, nor did the joint venture contract so provide. That contract, as we have said, was a profit sharing agreement between his alter ego, Palmdale, and Reeve, Inc. But in any event if the contract had been one for wages the law is that even a possibility of wages may be assigned when it is coupled with an interest. It is said in Cox v. Hughes, 10 Cal.App. 553, 557, 102 P. 956, 957, which we take to still be the law:
 
 
 66
 "The chance that A. may be employed some time in the future by B., and thereby earn wages, is, of course, a mere possibility not coupled with an interest, and it does not possess the element of negotiability. But, if the employment already exists, the wages to be earned from such employment, although a mere possibility, is coupled with an interest in A., and therefore assignable under the Code and the authorities. The proposition is so obvious as to require no further exposition."
 
 
 67
 The assignment of claims for wages, if sharing in the profits of the joint venture could be deemed wages, is a common practice. Walker v. Rich, 79 Cal.App. 139, 249 P. 56; Silverstein v. Oakland Title Insurance & Guaranty Co., 122 Cal. App. 73, 9 P.2d 846. So even if we assume here that the profits accruing from the grain bin contract with the Commodity Credit Corporation were wages, being coupled with an interest, they would be assignable.
 
 
 68
 It is asserted by appellants that no inquiry can be made into the question of corporate alter ego if no fraud or inequitable proposition is being shielded thereby. To that extent we will go, but the rule is hardly applicable here, where the entire plan conceived, dedicated, and put into operation by Hudson and his attorney Granger "scream fraud to the high heavens." In view of our general observations we need not dwell on this point.
 
 
 69
 Again, it is said that there can be no actionable fraud without damage and the creditors cannot be defrauded of that to which they are not entitled. In sustaining the finding of the Referee that Palmdale was the alter ego of Hudson we have demolished this contention, and it follows then that the creditors are entitled to the fruits of the joint venture, and being deprived thereof are being defrauded of that to which the law entitled them.
 
 
 70
 Appellants take the position that the earnings of the bankrupt, Hudson, were subject to his contract, as his property, and did not belong to his trustee in bankruptcy. Believing as we do that Palmdale was the alter ego of Hudson, that through it Hudson was entitled to share in the profits of the contract with the Commodity Credit Corporation, that this right accrued to him prior to or on the date of his adjudication in bankruptcy, that this right to share has a present and calculable value, then we conclude that it was such a property right as vested in the trustee, and that Hudson could not in any manner divest the trustee thereof, or diminish the value, by any action he might take, by contract or otherwise.
 
 
 71
 It is also argued that, assuming Palmdale to be the corporate alter ego of Hudson, yet the trustee and creditors are not entitled to the bankrupt's earnings and no fraud was intended or committed or inequitable position created. In support of this contention it is said that the conduct of the bankrupt or his attorney was not that of a man who was about to commit or in the course of perpetrating a fraud. Somehow we cannot be sold on this proposition. Quite to the contrary, the entire record supports the conclusion that while Hudson and Granger might not have had larceny in their hearts, certainly they at all times worked industrially to defraud Hudson's creditors out of some $350,000.00.
 
 
 72
 Appellants earnestly contend that the joint venture contract was not divisible; that the trustee having the burden of proof on this point failed to carry it; that one-half of the proceeds and profits therefrom must go to the bankrupt rather than to the bankruptcy estate.
 
 
 73
 We have read all of appellants' cases concerning the divisibility of the joint venture contract which appellants term the "most determinative of the various phases of this case."
 
 
 74
 In re Leibowitt, 3 Cir., 93 F.2d 333, 335, was a situation where the court determined that sums of money accruing to a bankrupt after adjudication by way of commissions paid to him on insurance policies written by him prior to adjudication were the property of the bankrupt and did not pass to his trustee. The contract between the insurance company and the bankrupt provided in detail the time, manner and method by which the bankrupt, as its agent, was to earn and be paid his compensation. The court there pointed out that regardless of the law of the state of domicile the provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., cut across state law, and that the right to collect money in the future is such a right as will pass to the trustee whether or not capable of being assigned under state law. It is said by the court that it is one of the salutary policies of the Bankruptcy Act that one's wages earned after adjudication belong to him and not to his trustee. To hold otherwise, said the court, would be to put the bankrupt into a type of involuntary bondage. With these comments we agree. However, a close scrutiny of the Leibowitt contract and the joint venture agreement with which we are here concerned indicates a great dissimilarity. Our case presents no "wage" feature, for Hudson, through the joint venture contract, "took a shot" at possible profits from the Commodity Credit Corporation deal which might be great, small, or none at all.
 
 In the Leibowitt case the court said:
 
 75
 "Had the bankrupt done all that he was required to do prior to adjudication to collect the compensation coming due, we have no doubt that a claim for this compensation would pass to his trustee and become an asset of the estate."
 
 
 76
 But, continued the court, such was not the factual situation in the Leibowitt case —
 
 
 77
 "One need only examine the sections of his contract of employment heretofore quoted, in order to see that substantial service still must be rendered by the bankrupt in order that the compensation referred to may become payable by the insurance company."
 
 
 78
 The court, affirming the findings of the Referee on the point, said there was no way of separating the compensation for what was done prior to adjudication from that done after.
 
 
 79
 "Since the productive elements of the bankrupt's labor are inseparable in point of time, we hold that no contract rights therein can be deemed to pass to his trustee; nor can the trustee obtain any right therein by virtue of legal execution or equitable sequestration. So holding, the decision of the court below is affirmed."
 
 
 80
 The Seiffert case, D.C., 18 F.2d 444, has been discussed and argued at length. There Seiffert, a grain farmer, lost his ranch to the bank. The banker then entered into a contract with him whereby he agreed to operate the ranch for several years at a salary of $40.00 per month, or for two-thirds of the grain harvest, which option was to be exercised within a few days after harvest. After the harvest Seiffert elected to take the two-thirds of the grain. It was there said that wages earned prior to adjudication belong to the trustee, after to the bankrupt. But there were no wages involved in the Seiffert case, and couldn't be until after the election between wages or a share of the crop. His choice wiped out the wage element, and the right to share the crop arose many months after adjudication.
 
 
 81
 This case is no guide in our present situation. The court said that the test was whether or not the bankrupt had at the time of adjudication any interest to be transferred. It held that he did not, and we agree. However, in our Hudson matter we find that on the date of Hudson's adjudication he, Hudson, had an assignable and transferable vested interest in the Commodity Credit Corporation contract, which as a property right passed to the trustee. There was no subsequent contingency permitting either of two types of contracts to come into being as in the Seiffert case, one of wages, the other crop sharing.
 
 
 82
 In the case of In re Thomas, 7 Cir., 204 F.2d 788, 795, 41 A.L.R.2d 971, Thomas had served as trustee in a state court for approximately one year before adjudication and three after. He was allowed $3,500.00 by the court as compensation for this period. It was there said:
 
 
 83
 "The portion of the fee which was earned prior to his petition in bankruptcy was not found, and an attempt to do so could only result in speculation and uncertainty. It could be that the major portion of the services rendered was prior to bankruptcy and, on the other hand, it could be that a major portion was rendered after bankruptcy. In other words, there is no way of determining what, if any, compensation was due him as trustee at the time he filed his petition in bankruptcy."
 
 
 84
 It will be observed that here the court was in a quandary as to the divisibility of the compensation, and in addition to that Thomas was a public official, a trustee of the court. The opinion can be supported, first, on the generally accepted proposition of law that where it is impossible to apply the "before and after" breakdown to the fund the entire amount goes to the bankrupt, the burden being on the trustee to make out a situation to which the "divisibility" test can be applied; and, second, on the basis of the long established line of cases holding it to be against public policy to permit the assignment of the salary of public officials. We do not think the Thomas case is in point here.
 
 
 85
 In Lockhart v. Mittlemann, 2 Cir., 1941, 123 F.2d 703, 704, the court was dealing with another state court appointed trustee. Here the trustee was adjudged a bankrupt on September 1st, 1939. On September 5, 1939, he filed his account with the court and asked for payment for services from July 1, 1938, to December 30, 1938. The court said the question is whether on September 1, 1939, his right to the allowance made was within the terms of Section 70, sub. a(5) of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a(5), saying:
 
 
 86
 "As we interpret the court's grant, the situation was therefore merely an instance of the doctrine that the officer of a court cannot assign his compensation for services any part of which he has not yet performed. There has never been any doubt that such a power would be likely seriously to chill the officer's zeal in the discharge of what remained of his duties, and courts have always denied it to him. On the other hand, if the services have all been rendered for which the allowance is made, the same reasoning does not apply, as we said in Fischer v. Liberty National Bank & Trust Co., supra, 2 Cir., 61 F.2d 757, in explanation of Milnor v. Metz, 16 Pet. 221, 10 L.Ed. 943. The dividing line is therefore whether the compensation has been so far `earned' that the officer's conduct thereafter is not a factor in determining its amount."
 
 
 87
 In the course of its opinion the court cited its previously decided case of Fischer v. Liberty National Bank & Trust Co., 2 Cir., 61 F.2d 757, and the New York case of In re Worthington, 141 N.Y. 9, 35 N.E. 929, 23 L.R.A. 97.
 
 
 88
 Another case cited by appellants is In re Coleman, 2 Cir., 87 F.2d 753, 754. This case involved money to become due an attorney on a contingent fee agreement. The attorney had, on the basis of his contingent fee agreement, begun a negligence action for his client in 1933. He was adjudged a bankrupt January 21, 1936. On March 11, 1936, a judgment was entered for his client. On appeal the judgment was affirmed, June 16, 1936. The trustee then made claim to the bankrupt's attorney fee. The court discussed the difference between the "charging" lien of the attorney which it said existed from the beginning of the attorney-client relationship and continued until final judgment or settlement, and the common law lien which attached at the time of the final judgment or "honest" settlement. Then, said the court:
 
 
 89
 "We must still determine whether an attorney under a contingent fee contract, prior to the creation of a fund by a favorable judgment or settlement, possesses any property or property right which passes to the trustee in bankruptcy. We think that he does not. Under the contract, the bankrupt had no rights till the services were fully performed and a fund was created. In re Woodworth, 2 Cir., 85 F.2d 50; and at common law no lien arose until that time."
 
 
 90
 In short, about all that the court said here was that a "charging lien" was not "property" such as would pass to the trustee under Section 70 of the Act. We think it too obvious for us to discuss the reasons why this case is not authority in Hudson's situation. No formula has been devised which furnishes a test for determining in all instances what contracts are severable and divisible, and what are entire. The primary criterion is the intention of the parties as determined from a fair construction of the provisions and terms of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question.
 
 
 91
 In Leeker v. Marcotte, 41 Ariz. 118, 15 P.2d 969, 972, the court cited with approval the following from Wooten v. Walters, 110 N.C. 251, 14 S.E. 734, 735, 736:
 
 
 92
 "A contract is entire, and not severable, when, by its terms, nature, and purpose, it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other, and interdependent. * * * On the other hand, a severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be. * * * This rule makes the interpretation of the contract depend on the intention of the parties as manifested by their acts and the circumstances of each particular case."
 
 
 93
 On the point under discussion here Benchley v. Durkee Famous Foods, 128 Cal.App. 604, 17 P.2d 1020, is an interesting case to read.
 
 
 94
 The distinguishing mark of a divisible contract is that it admits of apportionment of the consideration on either side to correspond to the unascertained consideration on the other. Garman v. Hoover, 95 Pa.Super. 203. It is difficult to lay down a rule which will apply to all cases, consequently each case must depend very largely on the terms and type of the contract involved.
 
 
 95
 In Waddell v. White, 51 Ariz. 526, 78 P.2d 490, 496, the court said:
 
 
 96
 "We think that perhaps the best test is whether all of the things, as as whole, are of the essence of the contract. That is, if it appeared that the purpose was to take the whole or none, then the contract would be entire; otherwise, it would be severable. Wooten v. Walters, 110 N.C. 251, 14 S.E. 734, 736. The divisibility of the subject matter, or the apportionment of the consideration, while they are both items to consider in determining whether a contract is entire or severable, are not conclusive."
 
 
 97
 A contract may be entire in the sense that there is but one agreement covering all the terms, and divisible in the sense that performance is divided into different groups. Primarily the intention of the parties control in determining the divisibility of a contract. And by agreement express or implied the parties may render divisible a contract which as originally drawn in the first instance was entire.
 
 
 98
 In concluding our remarks in connection with the cases upon which appellants would rely we do want to point out that in none of them could we detect the semblance of fraud, and in each the courts were dispensing justice between "clean handed" litigants. The strength and purpose of an equity court is to protect the unwary against the unscrupulous attempting to subvert its purpose by setting up its own benevolent maxims as a shield to fraud and chicanery. In this case before us the stench of fraud is unmistakable and appellants cannot now seek sanctuary in the benign court of equity.
 
 
 99
 Having concluded that Hudson "had a vested interest in, was the real party in interest in the joint venture contract with the Commodity Credit Corporation, and was entitled to share in the profits to be derived therefrom" it is obvious that even under the cases cited by appellants the contract became an asset of the trustee. In this connection we have also pointed out that in our opinion, Hudson, in lending his skill, experience and know-how in obtaining the Commodity Credit Corporation contract had, for all essential purposes, completed his part of the joint venture contract. It was the contribution of this skill, experience and know-how that was the consideration which induced Reeve to enter into the joint venture contract.
 
 
 100
 While it is true that the joint venture contract provides that Pacific-Palmdale Development Company will make the services of Hudson available to "procure and perform" contracts we have no hesitancy, on the state of the record, in holding as we do, that the real consideration was to "procure" the Commodity Credit Corporation grain bin contract.
 
 
 101
 From a reading of Paragraphs 2 and 5 of the venture agreement it is obvious that there was no salary or fixed compensation contemplated or agreed upon. It is said that the "availability" of Hudson is one of the inducing considerations. We do not subscribe to such a conclusion. The agreement required Reeve to "supply the management and all labor and material to supply any contract received after bidding on the same." What then was there for Hudson to do after a contract had been obtained? We can conceive of nothing except being available in the event Reeve wished to consult with him. We are of the opinion that when Paragraph 5 of the joint venture contract is read and reflected upon it becomes apparent that "procurement" was the task to be performed by Hudson, and that from then on it was up to Reeve to supply all financing, all management, all labor, all material "with the end in view of fulfilling all required work within the time specified."
 
 
 102
 True, it was agreed that Hudson would be "available" but that standing alone does not spell out a great deal. It is to be noted that the parties themselves treated Hudson's performance as having been virtually completed, for the first payment received from the Commodity Credit Corporation was divided equally between Reeve and Hudson, thus indicating that at the time of the procurement of the contract through Hudson's "know-how", he, Hudson, had become entitled to a one-half share of the profits without anything further to be done on his part. In any event the parties did not consider the "availability" of Hudson for consultative purposes of sufficient value or importance to withhold division of any of the Commodity Credit Corporation payments.
 
 
 103
 As we see it the real consideration running from Hudson to Reeve is the procurement of the contract with the Commodity Credit Corporation. The right thereafter to call upon Hudson in a consultative capacity we think is of little importance. This went into the contract on the basis of "the tail with the hide." As the contract itself indicates Reeve, from the moment that a contract was secured, was required "to forthwith supply the management and all labor and material * * * to the end in view of fulfilling all required work within the specified time."
 
 
 104
 It is our conclusion that (1) the joint venture contract is divisible, and (2) that, regardless of whether it is entire or divisible, performance had been to all intents and purposes completed at the time of the filing of the bid with the Commodity Credit Corporation on the 9th day of April, 1955, and prior to adjudication.
 
 
 105
 Perhaps we are dwelling overlong on this opinion but there is yet another facet that we would discuss. Appellants complain that there is no evidence in the record which would permit us to conclude, as we have, that the joint venture contract was divisible. We think that there is ample evidence in the record and so hold, even in the four corners of the joint venture agreement itself. But even if this were not so the appellants cannot profit from such a deficiency, for the situation if such existed, has been created by appellants themselves.
 
 
 106
 A reading of the transcript of testimony taken before the referee will show that every attempt on the part of the trustee to open up the divisibility angle of the joint venture contract was met with immediate and vociferous objections on the part of appellants. In each instance, when counsel for the trustee sought to enlighten the referee on this score, the objection, among others, was interposed that the questions were irrelevant, incompetent and immaterial. The record indicates that it is not through any lack of zeal on the part of the trustee's counsel that more evidence was not adduced on this point, but rather through appellants' blocking tactics.
 
 
 107
 It is hornbook law that a party who procures the exclusion of adverse evidence is estopped to assign as error the fact that the record is devoid of such evidence. The rule precluding an appellant from complaining of errors which he commits or invites, or from taking a position contrary to that adopted in the trial court, applies to errors in respect to the exclusion of evidence. In other words, one may not complain on review of errors below for which he is responsible. See Noble v. Miles, 129 Cal.App. 724, 19 P.2d 265, 266, stating:
 
 
 108
 "`Parties must abide by the consequences of their own acts and cannot seek a reversal of a case upon appeal for errors which they had committed or invited. One who by his conduct induces the commission of some error by the trial court, or, in other words, who has invited error, is estopped from insisting that the action of the court is erroneous.' 2 Cal.Jur. p. 846."
 
 
 109
 It was said in Brown v. Union Oil Company of Wichita, 114 Kan. 482, 218 P. 998, that a litigant cannot take a contrary position, one in which he has sought and procured an order, ruling, or judgment in the trial court, and another in the reviewing court in which he complains of such order, ruling or judgment. One may not on review complain of issues, proof, and variance where such errors were committed or invited by complainant, nor where the objection is inconsistent with the position taken below. The rule precluding an appellant from complaining of errors which he committed or invited, or from taking a position contrary to that taken below in the trial court, applies to errors in respect to the exclusion of evidence. When a party by his objections causes evidence which should have been admitted to be excluded he cannot draw presumptions in his favor from the excluded evidence. Gilmore v. Paris Inn, 10 Cal.App.2d 353, 51 P.2d 1103. Where a party prevents proof by his objection, or procures its exclusion he cannot object that such a fact is not proved. Erickson v. Svete, 200 Ill.App. 151.
 
 
 110
 One may not complain on review of errors going to the weight and sufficiency of the evidence where he is estopped under the general rules precluding one from changing his position in the trial court, or complaining of error committed or invited by him. In Starr v. Lee, 88 Cal.App. 344, 263 P. 376, 377, the court said:
 
 
 111
 "We find authorities holding that recovery cannot be had when the evidence shows that no damage at all resulted from the breach [of the contract], but the rule is not available to the appellant because, when respondent attempted to prove damage, he was foreclosed by appellant's objection that it was immaterial and irrelevant. Appellant cannot now say that the judgment should be reversed because this evidence was not admitted. Harp v. Harp, 136 Cal. 421, 424, 69 P. 28."
 
 
 112
 A defendant objecting to the admission of evidence and thus excluding it cannot complain on appeal of the plaintiff's failure to produce such evidence. Hill's Adm'x v. Metropolitan Life Insurance Co., 240 Ky. 172, 41 S.W.2d 935.
 
 
 113
 The Supreme Court in F. W. Woolworth Company v. Contemporary Arts, Inc., 344 U.S. 228, 231, 73 S.Ct. 222, 224, 97 L.Ed. 276, had this to say relative to evidence excluded by appellants' objections:
 
 
 114
 "Respondent proved loss of some customers and offered, but was not allowed, to show complaints from sales outlets about the Woolworth competition, decline in respondent's sales, and eventual abandonment of the line with an unsalable stock on hand. The trial judge excluded or struck most of this testimony on the ground that authority to allow statutory damages rendered proof of actual damage unnecessary. * * * However, petitioner cannot complain of this exclusion, which was in response to its objections."
 
 
 115
 In Mach v. Abbott Company, 8 Cir., 136 F.2d 7, 10, the following comment appears:
 
 
 116
 "Another settled rule of law is equally potent to bar the debtor's appeal * * *. Assuming, but not deciding, that the decision of the District Court in this regard is erroneous under the Act, still it is the law that a party cannot successfully complain of error for which he himself is responsible or of rulings which he has invited the trial court to make."
 
 
 117
 In Missouri, K. & T. Ry. Co. v. Elliott, 8 Cir., 102 F. 96, 103, the witness offered certain testimony and the defendant interposed objections to its admission, which were sustained by the court. The offered evidence was competent said the court.
 
 
 118
 "The rule is well settled that when the plaintiff offers and is ready to produce competent evidence to prove a material fact in issue, and the court erroneously rejects it on the objection of the defendant, the defendant will not afterwards be heard to say that the plaintiff failed to prove the fact which the rejected evidence would have established. The defendant will not be allowed to take advantage of his own wrong, or the errors of the court induced on his own motion, and compel the plaintiff to suffer the consequences. To allow him to do so would be a travesty on justice. It would encourage unfounded, groundless, and captious objections to evidence, and reward sharp practice and chicanery. The law of estoppel may be successfully invoked to prevent such results."
 
 
 119
 See also Kelso v. Slosburg, 120 Cal. App. 479, 8 P.2d 158, 160, wherein it was stated by the court:
 
 
 120
 "Appellant urges that there is no evidence in the record supporting the allegations of the complaint and the finding of the court that the contract of sale was fair, reasonable, and just and the property worth the price specified. The record shows that respondent attempted to introduce evidence to support this allegation of the complaint, but that it was excluded by the trial court on the objection of appellant. This ruling was unquestionably erroneous. The evidence having been excluded and the error committed at the instance of appellant, he cannot now complain of the lack of the evidence and take advantage of the erroneous ruling of the trial court for which he was responsible. Brandt v. Brandt, 85 Cal.App. 720, 260 P. 342. Further, there is some slight evidence in the record supporting the finding. Judgment affirmed."
 
 
 121
 In conclusion it can be said that a reviewing court will affirm where it appears that from the entire record the correct result has been reached, and we are of the opinion that the correct result was obtained both by the lower court and the referee. Substantial justice has been done and on that basis an appeal court will affirm the correct result even though some error may have been committed. If there was error below it may be said to have occurred in connection with the trustee's attempt to go into the divisible nature of the contract. However, if error there was, for the several reasons hereinabove set forth, it is now immaterial.
 
 
 122
 Appellants have said that this court is not bound by the Findings of Fact of the Referee. Be that as it may the findings of the Referee were approved by the District Court. We are of the opinion the record sustains the Referee's findings, and that they were properly sustained and approved by the District Court. The Referee's findings have the same dignity and carry the same weight as those of a special master, and will not be set aside unless clearly erroneous. Fed.Rules Civ.Proc. rules 52 (a) and 53(e) (2), 28 U.S.C.A. In Gold v. Gerson, 9 Cir., 1955, 225 F.2d 859, 860, the court said:
 
 
 123
 "Most of the points urged by Appellant involve questions of fact. On conflicting, and in some instances contradictory evidence, the Referee made Findings of Fact which were adopted by the trial court. * * * Such findings are presumptively correct and will not be set aside unless clearly erroneous. Fed.Rules Civ. Proc. rule 52(a), 28 U.S.C.A. The findings of the Referee and the trial court are sustained by the record and are clearly not erroneous."
 
 
 124
 In law cases the findings of fact of the lower court are equivalent to the verdict of a jury and will be disturbed on appeal only when shown to be clearly erroneous. In equity an appeal brings both the facts and the law before the reviewing court, and here both the law and facts have been reviewed by this court. Findings of fact of an equity court are not reviewable unless, on examination of all evidence, they appear to be clearly wrong. In our opinion the findings are supported by the evidence. Nor do we find any obvious error in the application of the law that would merit a reversal. The following quotes indicate the law:
 
 
 125
 "The findings of fact of a jury, special master, referee, or trial judge sitting in equity or without a jury will not be disturbed by an appellate court, unless a clear mistake has been made and there is no substantial testimony to support them. [cases cited.] We have carefully read the testimony, and, in our opinion, it abundantly supports the conclusions of the special master and District Judge." Wald v. Longacre, 3 Cir., 34 F.2d 25, 27.
 
 
 126
 "The rule that the findings of fact of a referee or special master which have been approved by the District Court will not be disturbed on appeal except on a clear showing of mistake, is of such universal recognition and uniform application in the federal courts as not to require citation of authority." Clements v. Coppin, 9 Cir., 72 F.2d 796, 798.
 
 
 127
 "Appellants concede that concurrent findings of master and judge upon conflicting evidence will not be set aside on appeal on anything less than a demonstration of plain mistake * * *." In re Nathanson Bros. Co., 6 Cir., 64 F.2d 912, 913.
 
 
 128
 "Under such circumstances, the findings of fact of the special master, so far as they depend `upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, * * * must be treated as unassailable.' Davis v. Schwartz, 155 U.S. 631, 636, 15 S. Ct. 237, 239, 39 L.Ed. 289." Southern Pac. Co. v. Western Pacific California R. Co., 9 Cir., 61 F.2d 732, 734.
 
 
 129
 In Ott v. Thurston, 9 Cir., 1935, 76 F. 2d 368, 369, the court had before it an appeal from the District Court confirming a referee's report, and overruling and denying appellant's petition for review. Citing from the opinion:
 
 
 130
 "Another error stressed by appellant is that the judge of the District Court erred in holding that where the evidence introduced before the referee in bankruptcy was conflicting, he was not at liberty to disregard the referee's findings. In that connection, the District Court stated in its opinion: `The evidence was at least conflicting, the District Court is not at liberty to disregard the Referee's finding for they find sufficient support in the evidence.' The court was here expressing the general rule of practice on review or appeal.
 
 
 131
 "`It is the recognized rule of the federal courts — and especially in matters of bankruptcy — that on review of the decision of a referee, based upon his conclusions on questions of fact, the court will not reverse his findings unless the same are so manifestly erroneous as to invoke the sense of justice of the court.' In re Stout, D.C.Mo., 109 F. 794. See also In re Noyes Bros., 1 Cir., 127 F. 286.
 
 
 132
 "As stated in O'Brien's Manual of Federal Appellate Procedure (1934 Cum.Supp., p. 63): `The Court of Appeals for the Ninth Circuit, quotes with approval the language of Remington on Bankruptcy, footnote to Sec. 3871, 4th Ed., Vol. 8, p. 227: "And it is especially true that the reviewing courts will not disturb findings of fact except for manifest error, where both the referee and the district judge have coincided." And the findings of a chancellor, based on testimony taken in open court, are presumptively correct and will not be disturbed on appeal, save for obvious error of law or serious mistake of fact.' Neece v. Durst, 9 Cir., 61 F.2d 591, 593; Swift v. Higgins, 9 Cir., 72 F.2d 791, 796; Exchange Nat. Bank [of Spokane] v. Meikle, 9 Cir., 61 F.2d 176, 179."
 
 
 133
 It is interesting to note that appellants' counsel concludes his discussion of these cases with this statement:
 
 
 134
 "The foregoing citations declare for the principle that an honest bankrupt shall not be required to labor throughout the future in a sort of involuntary servitude for his creditors, yet that is exactly what the district court decision would require of Mr. Hudson." (Italics ours.)
 
 
 135
 And again, in appellants' brief, it is said:
 
 
 136
 "The bankruptcy act is a benevolent statute. It contemplates that an honest debtor may, under its influence, rehabilitate himself financially."
 
 
 137
 How one who has used every device to enrich himself, at the expense of creditors holding better than $350,000.00 of claims, can continually make use of the expression "honest debtor" is something we cannot understand. In frustration we can only recite the old saw "that none are so blind as those who won't see."
 
 
 138
 We prefer, in any event, to view appellants' position in the light of the words of the court in the Thomas case, supra [204 F.2d 794]:
 
 
 139
 "It should be remembered that the bankruptcy law is for the benefit of distressed debtors, whereby they may obtain a discharge of their debts. It presupposes, however, that one who seeks its protection will deal honestly and fairly with his creditors by furnishing a complete and accurate schedule of his assets. A failure to do this, if intentional, is a fraud, the perpetrator of which is in a poor position to seek protection on the basis of equity. If the result be harsh to the bankrupt, it is because he has become the victim of his own handiwork."
 
 
 140
 The judgment of the district court is affirmed.