SOLBAR EASTERN CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Solbar Eastern Corp. v. Commissioner
Docket No. 4924-71.
United States Tax Court
T.C. Memo 1975-205; 1975 Tax Ct. Memo LEXIS 168; 34 T.C.M. (CCH) 880; T.C.M. (RIA) 750205; June 26, 1975, Filed Raymond Wallenstein, for the petitioner. Alan R. Herson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined that petitioner is liable, as transferee, for a deficiency in the amount of $87,731.30 in income tax, plus interest as provided by law, due from National Technology, Inc., for the taxable year ended November 30, 1966. The only issue for decision is whether petitioner is liable, under section 6901, [1]/ either at law *169 or in equity, for the unpaid income tax liabilities of National Technology, Inc. FINDINGS OF FACT Petitioner Solbar Eastern Corporation (hereinafter referred to as petitioner or Solbar) is a New York corporation with principal offices located in New York, New York. Its president is Solomon Eisenrod (hereinafter Eisenrod). National Technology, Inc. (hereinafter National or transferor), was incorporated under the laws of California. Also incorporated under the laws of California was Western Technology, Inc. (hereinafter Western). Wayne Copeland (hereinafter Copeland) was president of National and Western. Both corporations manufactured, distributed, and sold various electronic products. In September 1967, petitioner was retained by National, Western, Copeland, and Fred Barish (hereinafter Barish), an owner of a proprietary interest in National and Western, to obtain long-term financing for National and Western in the Eastern money market, or alternatively to arrange underwriting or acquisition by purchase or merger of either or both *170 of said corporations. Petitioner interested a New York commercial lender in extending long-term credit to National and Western, provided that all the borrowers' capital stock would be deposited with the lender as collateral for the loan. The loan was never extended because due to difficulties encountered in obtaining stock issuance permits from the California Commissioner of Corporations, no stock had been issued by either corporation. While petitioner was informed that ownership of National and Western was divided roughly 1/3 and 2/3 between Copeland and Barish and/or Mutual Equity Capital Corporation (hereinafter Mutual Equity), a small business investment corporation wholly owned by Barish, [2]/ respectively, petitioner was never advised that Copeland and Barish had agreed to any definite breakdown of their ownership interests. The most serious impediment to National's and Western's obtaining stock issuance permits was a marital dispute between Copeland *171 and his wife, Bertha Mae Copeland (hereinafter Mrs. Copeland), who claimed ownership rights in both corporations. Further confusion existed as to the precise beneficial ownership of both corporations because Copeland and Barish had promised certain individuals some of the stock: J. H. Mitchell, Jr. (hereinafter Mitchell), the attorney for both corporations and for Copeland and Barish; his associate, William F. Raff (hereinafter Raff) (5 percent to each); Robert J. Heller (hereinafter Heller), a former employee of National (10 percent); and Wynn Williams (an undisclosed percentage). Copeland, Barish, and petitioner soon realized that prospective lenders and underwriters would be reluctant to transact business with National and Western because of the dispute as to the beneficial ownership of the stock of these corporations. Therefore, in an attempt to assure prospective lenders and underwriters that outstanding potential claims to stock ownership would not be encountered, they agreed that petitioner, acting as agent for National, Western, Copeland, and Barish, would acquire options to purchase the proprietary interests claimed by Mrs. Copeland, Mitchell, Raff, and Heller. On February 22, 1968, an *172 agreement was reached between petitioner and Mrs. Copeland whereby, in consideration of $10,000 paid to her, petitioner acquired an option, extending to April 30, 1968, to purchase all of her "right, title and interest" in National and Western. The agreement elaborated upon petitioner's reasons for obtaining the option, namely in order to aid its attempts to secure financing or underwriting. The consideration was furnished by National and Western. The agreement further provided for two extensions of the original option period, each requiring a payment of $5,000 to Mrs. Copeland. Each of these payments was also supplied by National or Western. On February 23, 1968, petitioner obtained similar option agreements from Heller, Mitchell, and Raff. The funds paid to the optionors under these agreements were also supplied by National or Western. In April 1968, petitioner attempted to set forth in writing a more definitive statement as to the ownership of National and Western which would aid in its negotiations as agent for the corporations. The instrument recited that 2/3 of all ownership rights in both corporations were the property of Mutual Equity and that the remaining 1/3 belonged *173 to Copeland. The instrument also set forth a list of the various persons who claimed beneficial interests in the two corporations, stated that petitioner held such claimants' options, and provided that: SOLBAR will assign said options to acquire the aforesaid claims of Bertha Mae Copeland, Robert J. Heller, J. H. Mitchell, Jr. (and William F. Raff) and Wynn Williams to NATIONAL and/or WESTERN, or to such other persons as NATIONAL may in writing direct SOLBAR; * * * Neither National, Western, Copeland, nor Barish ever signed the document. In May 1968, Barish advised petitioner that, through the efforts of a "finder," negotiations had begun for the sale of the combined assets, subject to their liabilities, of both corporations to Omega Equities Corporation (hereinafter Omega) for approximately $700,000. Barish then requested petitioner, through Eisenrod, to attend the negotiations. Eisenrod did so until a contract of sale was executed on June 26, 1968. Eisenrod's participation was solely in the capacity of a consultant to Copeland and Barish, who themselves negotiated on behalf of National and Western. The Contract of sale, termed an "acquisition agreement," was executed by National, *174 Western, Copeland, and petitioner. Petitioner's signature (by Eisenrod) did not indicate any capacity other than that of a principal. The agreement was signed by petitioner after Omega's counsel, upon learning of the number of persons claiming beneficial interests in National and Western, insisted that the agreement be signed by all such claimants. Petitioner's signature was accepted in lieu of those of the other beneficial owners. As a precondition to its execution of the acquisition agreement, Omega also required that a "PLAN OF DISSOLUTION AND COMPLETE LIQUIDATION" (hereinafter the plan) for both National and Western be adopted so that these corporations might be dissolved immediately. An accompanying "Consent of Stockholder" (hereinafter consent) was signed by Copeland and petitioner (by Eisenrod) on June 25, 1968. Here, too, petitioner's signature appears on its face to have been in a principal capacity. However, petitioner signed the consent in its capacity as the agent of the various claimants and at the request of Omega's counsel. The plan recited that National's board of directors was comprised of Copeland and Solbar. Both the plan and consent identified Copeland and Solbar *175 as the only ones entitled to the issuance of all the stock of National. Notwithstanding the above recitals and provisions, neither Solbar nor Eisenrod ever served on the board of directors of National or Western or voted for directors or officers of those corporations. Moreover, petitioner was never employed by National to liquidate its assets. Following the execution of the acquisition agreement on June 26, 1968, and prior to or at the closing which occurred on August 14, 1968, petitioner was advised by Omega, Copeland, and Barish of a change in plans. The original plan called for a cash payment of $530,000 at the time of closing, directly from Omega to National and Western, to be disbursed by those corporations to Mrs. Copeland, Heller, Mitchell, and Raff, according to the various option agreements, and the balance of $170,000 to be paid by January 31, 1969. Instead, Omega had decided to make payments to those persons directly at the time of closing, with the balance of the cash payment due from Omega to be paid to petitioner as the disbursing agent for Copeland and Barish. Accordingly, at the time of closing, Omega made direct payment to Mrs. Copeland in the amount of $207,500, *176 to Heller in the amount of $24,000, and to Mitchell and Raff in the total amount of $24,000, in full release and discharge of all their claims and demands. From the remaining balance of the cash payment due from Omega at the closing, Omega retained $18,000 as reimbursement for moneys it had advanced on behalf of Copeland and Barish, paid $50,000 to the Small Business Administration (hereinafter the SBA) as receiver for Mutual Equity under an offer of settlement, [3]/ and paid the balance of $206,500 to petitioner, which received such sum as disbursing agent for Copeland and Barish. At the direction of Copeland and Barish, Omega's promissory note in the amount of $170,000, dated August 14, 1968, which represented *177 the balance of the purchase price, was made payable to Copeland and Solbar. The note provided that it was "non-negotiable but may be assigned in whole or in part by the payees, one to the other." Pursuant to this provision, Copeland assigned his interest in the note to petitioner in its capacity as disbursing agent for him and Barish for the balance of moneys payable under the note. At the closing on August 14, 1968, and during a period extending through September 19, 1968, petitioner, at the direction of Copeland and Barish and with the knowledge of Omega, made the following disbursements from the $206,500 transferred to it by Omega: Payee
Amount
Purpose
Samuel Miller
$31,750.00
Legal fees of Barish
Leo Bromberg
26,500.00
Finder's fee
National and
Repayment of
Western
13,328.13
moneys owed by
Copeland and Barish
Heller
4,000.00
Wallenstein &
Legal fees for
Field
1,696.52
preparation of
option agreements
Barish
25,000.00
On January 6, 1969, petitioner received from Omega $150,000 in partial payment of the $170,000 promissory note. The balance of $20,000 was withheld by Omega as security for the guarantee by National and *178 Western of the receivables transferred to Omega. Shortly after receipt of the above payment from Omega, petitioner was directed by Barish to disburse $40,000 to him. At that time, petitioner cautioned Barish that his liability to the SBA [4]/ and that of Omega were yet unsettled. Petitioner advised that such disbursement should be postponed. Barish, however, persisted in his request and directed petitioner to disburse the funds. After obtaining Copeland's approval, petitioner paid the $40,000 to Barish. During the period extending from January 7, 1969, through July 23, 1969, petitioner, at the direction of Copeland and Barish and with the knowledge of Omega, made the following disbursements from the remaining $254,225.35 of the total $356,500 it had received from Omega: Payee
Amount
Purpose
Copeland
$ 5,000.00
Leo Bromberg
5,000.00
Finder's fee
Samuel Miller
5,175.00
Legal fees
of Barish
Harvey Pulvers
500.00
Accounting fee
of Barish
Barish
[1]/ 130,000.00
*179 By letter dated June 18, 1969, Omega withdrew the settlement it had previously offered the SBA and requested return of the $50,000 check it had enclosed with its offer. On June 23, 1969, the SBA acknowledged the withdrawal of the offer and returned the $50,000 check. Omega then transferred the $50,000 directly to Barish. Barish decided to negotiate his own settlement with the SBA. Thereupon, petitioner advised Barish that it desired to terminate its relationship with him and Copeland. Petitioner received a letter dated August 8, 1969, from Barish, described as a "settlement of account," which is as follows: This will confirm that: I, Fred Barish of Beverly Hills, California, engaged you, as my agent, to conclude arrangements for the sale of all of the assets of National Technology Inc. ("National") and Western Technology Inc. ("Western") a California corporation, to Omega Equities Corporation ("Omega") a Delaware corporation with Omega assuming the payment of the liabilities of National and Western; which was effected by the written agreement of sale dated June 26, 1968, and closing papers dated August 14, 1968, which *180 agreement and Closing instruments I had authorized and approved and hereby ratify and confirm. I have copies of the purchase and sale agreement of June 26, 1968, and of the different instruments exchanged at the August 14, 1968 Closing as well as copies of all instruments issued and received by you. At my instructions you purchased from Robert J. Heller, for $25,000 all of his rights, as a person entitled to receive stock and otherwise in National and Western, by option dated February 23, 1968, and Sale instrument dated August 14, 1968, all of which you were authorized to do, and all of which is hereby ratified and confirmed. At my instructions you purchased from Messrs. J. H. Mitchell and William F. Raff, for the sum of $25,000. their rights as persons entitled to receive stock and otherwise, in National and Western by option dated February 23, 1968, and Release dated August 14, 1968, all of which you were authorized to do and all of which is hereby ratified and confirmed. At my and Wayne Copeland's instructions you purchased from Mrs. Bertha Mae Copeland all of her rights and interest in National and Western for the sum of $227,500, which you were authorized to do and which *181 is hereby ratified and confirmed. You have previously paid to Wayne Copeland the sum of $5,000. at my directions. I agree to have an accounting with Wayne Copeland and I agree to hold you harmless from any claims that hereafter may be made by him. The first installment of $530,000 was paid by Omega, as follows: To - Bertha Mae Copeland
$207,500
Robert J. Heller
24,000
Mitchell & Raff
24,000
SBA - Receiver for
Mutual Equity Corp.
50,000
Solbar Eastern Corp.
206,500
Retained for advances on
behalf of Copeland
& Barish
18,000
$530,000
The second installment of $150,000 was paid by Omega to you ($170,000 less $20,000 for losses on receivables, etc.). Total amount received by Solbar Eastern Corp. $356,.500. The foregoing breakdowns and distributions were approved and are hereby ratified and confirmed. You disbursed from such receipts of $356,500 at my request the following: To - Samuel Miller
$ 37,925.00
Wayne Copeland
5,000.00
Leo Bromberg
31,500.00
National & Western
13,328.13
Robert Heller
5,000.00
Wallenstein & Field,
Esqs.
3,050.52
Fred Barish
155,000.00
Harvey Pulvers
500.00
Mitchell & Raff
1,000.00
$252,303.65
*182 You were authorized to make each of these payments and same are hereby approved. You are to retain for yourself for your
services the sum of
$ 62,500
From the receipts of
$356,500
there is therefore deducted
the sum of
$314,803.65
leaving a balance of
$ 41,696.35
to be remitted to me.
I acknowledge that you paid over to me all monies received by you for management and consulting services to Omega under letter agreement dated June 28, 1968. I have, and do hereby agree to hold you harmless and to indemnify you for any loss you may sustain from the claims of any person, firm, corporation or government by virtue of the actions taken, and all instruments executed by you, in these matters, including the disbursements of moneys made by you. Yours truly, /s/ Fred Barish / Fred Barish On August 8, 1969, petitioner disbursed the remaining $41,696.35 to Barish. From the amount received from Omega, petitioner deducted $62,500 for its agreed compensation and expenses and obtained a general release from Barish. National had filed its Federal income tax return for the taxable year ended November 30, 1966, with the District Director of Internal Revenue *183 at Los Angeles, California. On March 12, 1970, respondent sent to National a notice of deficiency determining a deficiency of $87,731.30 in income tax for the taxable year ended November 30, 1966. National, the transferor, has not paid the deficiency. In his statutory notice dated April 9, 1971, to petitioner, respondent determined that petitioner is the transferee of assets of National and, as such, is liable for the transferor's income tax deficiency to the extent of the fair market value of any assets so received. Petitioner denies any such liability. ULTIMATE FINDINGS OF FACT 1. Petitioner was neither a shareholder nor an owner of any beneficial interest in National. 2. Petitioner obtained and held options to purchase various claimants' interests in National and Western solely as agent for National, Western, Copeland, and Barish. 3. Petitioner received, held, and disbursed, solely as agent for Copeland and Barish, $206,500 received from Omega on August 14, 1968, and $150,000 received from Omega on January 6, 1969. OPINION Section 6901(a)(1)(A)(i) [5]/ authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability *184 for income taxes. The section does not purport to create a new liability but rather merely provides a method of collecting an existing liability. Patricia E. Mysse,57 T.C. 680, 700-701 (1972). Whether one is liable under section 6901 as a transferee is a question of State law. Commissioner v. Stern,357 U.S. 39, 45 (1958). The burden of showing that petitioner is liable as the transferee of the property of National rests with respondent. Sec. 6902(a). [6]/ *185 Respondent contends that petitioner was an owner of a proprietary interest in National; that National sold all of its assets to Omega and then dissolved; and that instead of paying National for the assets, Omega paid National's beneficial owners directly, petitioner receiving $564,000 from Omega. Respondent would have us hold that petitioner is therefore liable for National's income tax deficiency. Petitioner contends it is not liable as transferee because it had no beneficial interest in National but, in its dealings with National, was the agent of National, Western, Copeland, and Barish. We hold for petitioner. In none of the papers filed in this case has respondent informed the Court what State law he relies upon to support his claim that petitioner is liable as transferee of National. Cf. C.B.C. Super Markets, Inc.,54 T.C. 882, 898 (1970). The California statute which appears to fit most closely the argument which he presents, however, is Cal. Civ. Code sec. 3439.04 (West 1970).[7]/ That section provides that every conveyance made by a person who is or will be thereby rendered insolvent is fraudulent as to creditors if the *186 conveyance is made without a fair consideration. Respondent has not shown that petitioner owned any of the stock of National or that it received any of National's assets for its own account except as reimbursement for expenses and as compensation for the services which it performed for and on behalf of its principals, National, Western, Copeland, and Barish. The evidence that petitioner was only an agent and not the beneficial owner of National's stock is overwhelming. Eisenrod's testimony on this point is unequivocal. Cf. Kelley v. R. F. Jones Co.,272 Cal. App. 2d 113, 77 Cal. Rptr. 170, 174 (2d Dist. Ct. App. 1969). All of the money paid for the options came from National or Western. None of it came from petitioner. Barish's letter of August 8, 1969, to petitioner, quoted in our Findings and setting forth the settlement *187 of account, leaves no doubt that petitioner was only an agent and that petitioner distributed to others the proceeds of the Omega sale. When read in the light of these facts, the option agreements signed by petitioner with Mrs. Copeland, Heller, Mitchell, and Raff indicate petitioner was acting on behalf of others. Moreover, the unsigned document, prepared in April 1968, signifies an agency relationship in that it states that petitioner was to assign the options to "NATIONAL and/or WESTERN, or to such other persons as NATIONAL may in writing direct SOLBAR." The failure of the parties to sign this document is not fully explained, but there is no suggestion that such failure was due to any question as to petitioner's rights or status. Rather, it was apparently due to the difficulties that some of the other parties were having in defining their interests. It is true that petitioner signed several contracts in its own name without disclosing its agency relationship. Those agreements are nonetheless the contracts of petitioner's principals. Marr v. Postal Union Life Ins. Co.,40 Cal. App. 2d 673, 105 P. 2d 649, 653 (2d Dist. Ct. App. 1940). As in other areas of taxation, *188 the form in which these transactions were cast cannot be allowed to override their substance. Commissioner v. Southern Bell Tel. & Tel. Co.,102 F. 2d 397, 402 (6th Cir. 1939), affirming 34 B.T.A. 540 (1936). Where an agent receives the proceeds of the sale of stock (or of the liquidation of a corporation) and disburses those proceeds to the beneficial owners, the agent is not liable as a transferee under section 6901. Commissioner v. Southern Bell Tel. & Tel. Co.,supra at 402; Leon G. Grieb,36 T.C. 156, 169 (1961); Estate of Frank Work,16 T.C. 863, 869 (1951); Paulyn E. Tomfohr,44 B.T.A. 730, 733-734 (1941); Kizzie Gordon,27 B.T.A. 377, 384-385 (1932); M. H. Graham,26 B.T.A. 301, 302-303 (1932), appeal dismissed sub nom. Commissioner v. Estate of H. C. Stone,63 F. 2d 997 (9th Cir. 1933); R. E. Burdick,24 B.T.A. 1297, 1303-1304 (1931); Ezra Gould,21 B.T.A. 824, 827-828 (1930); John Robert Brewer,17 B.T.A. 713, 716-717 (1929), appeal dismissed (5th Cir. 1932). *189 The $62,500 retained by petitioner represented a fee of $50,000 as compensation for its services and reimbursement of $12,500 for expenses incurred in the transaction. We think the record fairly shows that petitioner's services and expenses on behalf of National and its beneficial owners were adequate consideration for the amount so retained. Certainly, respondent has failed to prove otherwise. See Estate of Henry Miller,42 T.C. 593, 599-600 (1964); cf. Benoit v. Commissioner,238 F. 2d 485, 493 (1st Cir. 1956), remanding on other grounds 25 T.C. 656 (1955). We hold that respondent has not shown that petitioner is liable, at law or in equity, for National's unpaid income tax deficiency. Decision will be entered for the petitioner.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. /↩ Mutual Equity was in receivership as a result of action taken by the Small Business Administration. It had loaned National and Western large amounts of money which, as of June 30, 1968, amounted to $210,354.38.
3. /↩ In conjunction with the execution of the acquisition agreement, Barish entered into an agreement dated June 21, 1968, with Omega whereby he agreed, among other things, to pay $75,000 to the SBA out of the proceeds received by National and Western on the closing of the acquisition agreement and an additional $50,000 to the SBA from the $170,000 due National and Western by Jan. 31, 1969. These amounts represented part of the $300,000 owed to the SBA by Barish.
4. /↩ On the closing date, Omega proposed to the SBA that it would pay $500,000 owed to the SBA by Mutual Equity at the rate of $50,000 per year with 5-percent interest per annum.
1. /↩ Includes the $40,000 payment referred to above in text.
5. / SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), ↩
6. / SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof.--In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.↩
7. /Cal. Civ. Code (West 1970): Sec. 3439.04 Conveyances by insolvent Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.↩